# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 2, 2009

Charles R. Fulbruge III
Clerk

No. 08-70045

CHARLES RAY CRAWFORD

Petitioner - Appellant

v.

CHRISTOPHER B EPPS, COMMISSIONER, MISSISSIPPI DEPARTMENT OF CORRECTIONS

Respondent - Appellee

Appeal from the United States District Court
for the Northern District of Mississippi
USDC No. 3:04-CV-59

Before WIENER, STEWART, and CLEMENT, Circuit Judges.

PER CURIAM:[*]

In 1994, Charles Ray "Chuck" Crawford was sentenced to death for capital murder. Crawford's conviction and sentence were affirmed on direct appeal; his state application for post-conviction relief was denied by the Mississippi Supreme Court; his federal § 2254 habeas petition was denied by the federal district court; and his request for a certificate of appealability (COA) was denied by the district court. He now moves this court for a COA on eighteen separate

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

claims. We grant him a COA on one of those claims, deny relief on the remainder, and remand for further proceedings.

## FACTS AND PROCEEDINGS

On the evening of January 29, 1993, twenty-year-old Kristy Ray was abducted from her parents' home in Chalybeate, Mississippi. At that time, Charles Ray Crawford was awaiting a February 2 trial on unrelated charges of aggravated assault and rape. Earlier on January 29, Crawford's family had discovered a ransom note in the attic of the house where Crawford was living. Concerned that Crawford was planning a kidnapping, the family members consulted the lawyer representing Crawford on the aggravated assault and rape charges, William Fortier. Fortier then contacted the police to report the possibility that a crime was being committed. The following day, Fortier's law clerk turned over Crawford's mental health records, which were in his possession, to the FBI.

Within hours of Ray's disappearance, local, state, and federal authorities had begun an investigation. On the evening of January 30, approximately twenty-four hours after Ray's disappearance was first reported, officers observed Crawford approach a residence where they were stationed. Crawford was arrested; he had a shotgun and switchblade knife in his possession. Subsequently, Mississippi state police officers and FBI agents administered *Miranda* warnings and the FBI agents conducted their first of three interviews with Crawford. During the first interview, the FBI agents learned from Crawford that Ray was no longer alive. He then agreed to lead the authorities to Ray's body. After approximately one hour of walking through the woods, they found Ray's body. She had suffered a stab wound to the heart and left lung and showed signs of anal penetration.

On February 1, Crawford was interviewed for a second time by the FBI and state highway patrol officers. He was read his *Miranda* rights and executed

2

a written waiver of those rights. During this interview, Crawford described additional events leading up to Ray's murder. He recounted a story in which he suffered two blackouts, one immediately prior to Ray's abduction and one prior to her death. According to Crawford, when he awoke from the second blackout, he knew immediately that Ray was dead. He stated that he then hid her body and began to make his way out of the woods.

A third interview was conducted on February 2, in order to help authorities locate a revolver and knife that Crawford had lost. Crawford told the interviewers where he had lost the items, which were found together.

Crawford was ultimately charged in a four-count indictment for burglary of an inhabited dwelling, rape, sexual battery, and capital murder. At his trial, which began in April 1994, he presented an insanity defense, which included expert testimony that he suffered from psychogenic amnesia and bipolar disorder. The jury found Crawford guilty on all four counts.

Following the presentation of evidence at the sentencing phase, the jury returned a sentence of death on the capital murder conviction. It specifically found three aggravating factors: (1) that Crawford was previously convicted of a felony involving the use or threat of violence; (2) that the offense was committed during the crime of kidnapping; and (3) that the offense was especially heinous, atrocious, or cruel.

The conviction and death sentence were affirmed on direct appeal by the Mississippi Supreme Court on March 12, 1998. *Crawford v. State*, 716 So. 2d 1028 (Miss. 1998) [hereinafter *Crawford I*]. That court denied Crawford's petition for post-conviction relief on December 4, 2003. *Crawford v. State*, 867 So. 2d 196 (Miss. 2003) [hereinafter *Crawford II*]. He filed an application for a writ of habeas corpus under 28 U.S.C. § 2254 in the Northern District of Mississippi on September 27, 2004. The district court denied that application on September 25, 2008, *Crawford v. Epps*, 2008 WL 4419347 (N.D. Miss. Sept.

25, 2008) [hereinafter *Crawford III*], and a COA was denied on November 25, 2008. Crawford moves this court for a COA of the district court's denial of his writ application.

## STANDARD OF REVIEW

Before appealing a district court's denial of habeas relief under § 2254, a petitioner must obtain a COA. *See* 28 U.S.C. § 2253(c). This court may issue a COA only if the petitioner "has made a substantial showing of the denial of a constitutional right." *Id.* § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). "[A] claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Id.* at 338. Further, in a death penalty case, doubts whether a COA should issue must be resolved in petitioner's favor. *See Avila v. Quarterman*, 560 F.3d 299, 304 (5th Cir. 2009).

## DISCUSSION

In his motion, Crawford seeks a COA on eighteen separate claims. The court considers each in turn.

## A. Whether Crawford's statements were obtained in violation of the Fifth, Sixth, and Fourteenth Amendments

Crawford asserts that he was denied his Sixth Amendment right to counsel during the interviews conducted by the FBI. He also asserts that his Sixth Amendment rights were violated by the state's delay in providing him an initial appearance.

In the district court, Crawford argued that his Sixth Amendment right to have counsel present during the February 1 and February 2 interrogations was

violated.[1] He contended that his right to counsel attached on February 1, when an arrest warrant, supported by a general affidavit, issued for capital murder. He asserted that he was thereafter denied his right to counsel when interrogations continued without a lawyer present. He further asserted that he was denied a prompt initial appearance because he was not brought before a magistrate until February 3, the day after he gave his last statement. The state argued in the district court that Crawford's Sixth Amendment right attached when his initial appearance occurred or ought to have occurred.[2] It further argued that the delay in providing an initial appearance was not unreasonable under the circumstances.

The district court rejected Crawford's contention that his Sixth Amendment right attached upon issuance of the arrest warrant, but made no finding of when the right did in fact attach. Instead, the court ruled that even if Crawford's right to counsel had attached by the time of the February 1 and February 2 interviews, he had not invoked that right but, to the contrary, had made a knowing and voluntary waiver of it after being advised of his *Miranda* rights.

---

[1] Crawford also argued that his Fifth Amendment right to have counsel present during the January 30 interrogation was violated. The district court held that this claim was barred because of an independent and adequate state procedural rule and, alternatively, held that the claim failed on its merits. *See Crawford III*, 2008 WL 4419347, at *12. In his brief on appeal, Crawford offers no argument challenging the district court's primary or alternative resolutions of the claim and therefore shows no entitlement to a COA on the Fifth Amendment claim.

[2] The state's response to Crawford in the district court seems to equate the federal right to counsel under the Sixth Amendment with the right to counsel under the Mississippi Constitution. However, Mississippi law is equivocal on whether this proposition is correct. *Compare Johnson v. State*, 631 So. 2d 185, 187-88 (Miss. 1994) ("Under the Mississippi Constitution, the right to counsel attaches once the proceedings reach the accusatory stage, which is earlier in the day than does the federal right." (quotations omitted)), *with McGilberry v. State*, 741 So. 2d 894, 904 (Miss. 1999) ("The right to counsel, at both the federal and state level, attaches at the point in time when the initial appearance . . . ought to have been held.").

It is "beyond doubt that the Sixth Amendment right to counsel may be waived by a defendant, so long as relinquishment of the right is voluntary, knowing, and intelligent." *Montejo v. Louisiana*, 129 S. Ct. 2079, 2085 (2009). When, as here, a defendant "is read his *Miranda* rights (which include the right to have counsel present during interrogation) and agrees to waive those rights," such a waiver suffices to waive the Sixth Amendment right to counsel. *Id*; *see also Patterson v. Illinois*, 487 U.S. 285, 296 (1988) (holding that an accused advised of his *Miranda* rights "has been sufficiently apprised of the nature of his Sixth Amendment rights").

The district court found Crawford to have waived his right to counsel on both February 1 and February 2. *Crawford III*, 2008 WL 4419347, at *13. Crawford does not attack the district court's determinations that he never invoked his right to counsel and that he executed written waivers of that right. Crawford has not made a substantial showing that his Sixth Amendment right to counsel was denied.

Crawford also contends that the state's delay in providing him an initial appearance led to a deprivation of his Sixth Amendment right to counsel. Crawford's claim lacks merit. As mentioned, the law enforcement officials fully informed Crawford of his right to counsel by giving *Miranda* warnings prior to each interview. The Supreme Court has held that such warnings "sufficiently apprise[]" a defendant "of the consequences of abandoning [his Sixth Amendment] rights, so that his waiver on this basis will be considered a knowing and intelligent one." *Patterson*, 487 U.S. at 296. Moreover, the district court found that Crawford confessed his involvement within an hour of his arrest. It found "no evidence of a causal connection between the asserted delay and Petitioner's confession." *Crawford III*, 2008 WL 4419347, at *13.[3] "Where

___

[3] The district court made no finding whether the February 3 hearing was sufficiently prompt under federal law.

6

there is no evidence to support a finding that the delay was for the purpose of obtaining a confession, there is no evidence that the delay had a coercive effect on the confession, there is no causal connection between the delay and the confession, and the confession was otherwise voluntarily given . . . the defendant has not shown prejudice by the delay." *United States v. Mullin*, 178 F.3d 334, 342 (5th Cir. 1999) (quotation and alteration omitted) (omission in original). The request for COA on this claim is denied.

## B. Whether Crawford's statements were inadmissible "fruit of the poisonous tree" because his arrest for Ray's murder was not supported by probable cause

Crawford contends that the statements he gave during his interviews with the FBI, as well as during his psychiatric evaluation, should not have been admitted at trial because there was no probable cause for his initial arrest. He did not present this claim to the state courts either on direct appeal or in his state post-conviction application. His failure to exhaust available remedies at the state level precludes relief on this claim at the federal level, absent a showing of cause for the default and actual prejudice. *See Martinez v. Johnson*, 255 F.3d 229, 238-39 (5th Cir. 2001). Because Crawford offers no argument demonstrating cause and prejudice for his failure raise the claim in state court, a COA is denied.

## C. Whether Crawford was subjected to a psychiatric evaluation of his competency to stand trial without the benefit of counsel in violation of the Sixth Amendment

Pursuant to a state court order dated February 1, 1993, Crawford was evaluated by psychiatric personnel at the Mississippi State Hospital to determine whether he was "competent and sane" to proceed to trial on the unrelated assault and rape charges, which was scheduled for February 2. The order, which was made part of the assault and rape case's docket, was approved

7

and signed by William Fortier, Crawford's counsel in that case, as "Attorney for Defendant." Although the exact time is not clear from the record, the evaluation occurred no later than February 2, 1993.

During Crawford's murder trial, information contained in the psychiatric evaluation was apparently used to discredit his insanity defense. The evaluation stated, under a section headed "Knowledge of the Court": "[Crawford] understands that he may be indicted for capital murder in the most recent alleged offenses and understands how a capital and non-capital trial would differ." In the "Knowledge of the Alleged Offenses" section, the report details Crawford's reported state of mind prior to and during Ray's murder. And in the "Forensic Opinions" section, the evaluation states that Crawford was not suffering from a mental disorder which prevented him from knowing right from wrong "at the time of the alleged offenses," although it is not clear whether these "offenses" include Ray's murder.

Crawford argues that he was subjected to a psychiatric evaluation without the benefit of counsel, in violation of the Sixth Amendment.[4] To the extent Crawford argues that he was entitled to have an attorney present during the examination, his claim lacks merit. He cites no authority for such a proposition and, moreover, the Supreme Court has declined to recognize such a right under the Sixth Amendment. *See Estelle v. Smith*, 451 U.S. 454, 470 n.14 (1981) [hereinafter *Smith*]; *United States v. Byers*, 740 F.2d 1104, 1119 & n.16 (D.C. Cir. 1984) (noting the Supreme Court's disavowal of any Sixth Amendment right to have counsel present during a psychiatric examination).

To the extent Crawford argues that he should have had the benefit of counsel in deciding whether to undergo a psychiatric evaluation, however, his

---

[4] Crawford does not challenge the district court's determination that he was notified of his rights under the Fifth Amendment by the examining psychiatrist, Dr. W. Criss Lott. *See Crawford III*, 2008 WL 4419347, at *13.

claim is colorable. Fortier, Crawford's counsel on the unrelated rape and assault charges, approved the examination. In light of the fact that Crawford's rape and assault counsel approved the examination, that Crawford was advised of his *Miranda* rights by the examining physicians, and that he presented an insanity defense in the rape and assault trial, the use of the evaluation during that trial would not have offended Crawford's Fifth or Sixth Amendment rights. Crawford's contention, however, is that the psychiatric evaluation, ostensibly performed for the purpose of determining competency in the rape trial, was improperly used against him in the murder trial.

A series of Supreme Court decisions, dating from *Smith* to *Penry v. Johnson*, 532 U.S. 782 (2001), provides guidance in this area. As a starting point, in *Smith*, the Court held that a defendant has a Sixth Amendment right to counsel's assistance "in making the significant decision of whether to submit to the [psychiatric] examination and to what end the psychiatrist's findings could be employed." 451 U.S. at 470-71; *id.* at 471 ("[A] defendant should not be forced to resolve such an important issue without 'the guiding hand of counsel.'" (quoting *Powell v. Alabama*, 287 U.S. 45, 69 (1932))). In 2004, the Third Circuit provided this concise summary of the law:

> A compelled psychiatric interview implicates Fifth and Sixth Amendment rights ( *Smith* ). Before submitting to that examination, the defendant must receive Miranda warnings and (once the Sixth Amendment attaches) counsel must be notified ( *Smith* ). The warnings must advise the defendant of the "consequences of foregoing" his right to remain silent ( *Smith* ). The Fifth and Sixth Amendments do not necessarily attach, however, when the defendant himself initiates the psychiatric examination ( *Buchanan*,[5] *Penry* ). Similarly, the Fifth — but not Sixth — Amendment right can be waived when the

___

[5] *Buchanan v. Kentucky*, 483 U.S. 402 (1987).

> defendant initiates a trial defense of mental incapacity or disturbance, even though the defendant had not been given Miranda warnings ( *Buchanan*, *Powell*[6] ).  But that waiver is not limitless; it only allows the prosecution to use the interview to provide rebuttal to the psychiatric defense ( *Buchanan*, *Powell* ).  Finally, the state has no obligation to warn about possible uses of the interview that cannot be foreseen because of future events, such as uncommitted crimes ( *Penry* ).

*Gibbs v. Frank*, 387 F.3d 268, 274 (3d Cir. 2004).

In *Penry v. Johnson*, the defendant Penry committed a capital crime in 1979.  Previously, in 1977, a psychiatric evaluation of Penry had been prepared for an unrelated case.  532 U.S. at 786, 793.  That 1977 report was admitted into evidence in the capital trial.  Penry argued that its use infringed his Fifth Amendment right against self-incrimination. *Id*. at 793.  Although it decided the question against Penry on AEDPA standard-of-review grounds without reaching the merits of his Fifth Amendment claim, the Court noted, *inter alia*, that the defendant had affirmatively put his mental state at issue and that the 1979 crime had not been committed when the 1977 examination took place.  *Id*. at 794.  The Court observed that "[t]he differences between this case and [*Smith*] are substantial."  *Id*. at 795.

Although the *Penry* Court viewed the issue through a Fifth Amendment rather than Sixth Amendment lens, its reasoning is instructive in this case. Here, Crawford was without a lawyer in the murder case and thus had no legal counsel to advise him about whether to submit to the examination, which could have prejudiced (and allegedly did prejudice) his murder defense.  Unlike Penry, Crawford had already committed the Ray murder and intended to present an insanity defense in the assault trial.  It was therefore foreseeable that his

---

[6] *Powell v. Texas*, 492 U.S. 680 (1989).

mental state could be placed at issue during any ensuing capital murder trial. Under *Smith*, Crawford may have had a right to a lawyer's advice "in making the significant decision of whether to submit to the examination *and to what end the psychiatrist's findings could be employed.*" *Smith*, 451 U.S. at 471 (emphasis added).

The Mississippi Supreme Court, on collateral review, concluded that "it is apparent that [Fortier], at the very least, had notice of the fact that the examination would take place as he signed off on the examination order." 867 So. 2d at 205. The district court similarly concluded that "the court's order notified Mr. Fortier of the purpose and scope of the examination sufficient to satisfy the Sixth Amendment." 2008 WL 4419347, at *13. Fortier's approval likely satisfied any Sixth Amendment concerns in the rape and assault case, but whether it afforded Crawford adequate protection in the murder case is a distinct inquiry that should be treated separately. This court concludes that "jurists of reason could disagree with the district court's resolution of [this] constitutional claim[]" and grants a COA. *Miller-El*, 537 U.S. at 327.

Although the district court touched upon the merits of this claim, the present state of the record counsels in favor of remanding to that court for further consideration after additional briefing. The relevance of Fortier's participation to Crawford's Sixth Amendment claim was not adequately briefed. Further, the effect of Crawford's waiver of his Sixth Amendment right to counsel, discussed *supra*, and whether that waiver would extend to any decision to submit to a psychiatric evaluation were issues not adequately explored by the briefs. Should the district court be so inclined, it may develop the record on the timing of Crawford's representation in the two criminal proceedings; it may also conduct an evidentiary hearing to assist its resolution of this claim. *See, e.g.*, *United States v. Herrera*, 412 F.3d 577, 582 (5th Cir. 2005).

11

**D.** **Whether Crawford's statements were obtained through the use of confidential medical records that were procured without a warrant or consent**

The day prior to Crawford's arrest, FBI Agent Newsom Summerlin obtained his mental health records from William Fortier's law clerk, without Crawford's consent. These documents, which were not made part of the record in the state court or the district court, appear to have been evaluations prepared in anticipation of Crawford's rape trial. Crawford contends that law enforcement officials unlawfully obtained these records and used the information they contained to extract a confession. He argues that the confession, which was admitted at trial, was inadmissible "fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963).

Crawford is unable to show any illegality in the release of the records to the FBI. He asserts that their disclosure was a violation of the attorney-client privilege. However, both the state court and the district court found that the records were disclosed in an attempt to prevent the commission of a crime, which, in 1993, was an exception to the attorney-client privilege.[7] *See* MISS. RULES OF PROF'L CONDUCT 1.6(b)(1) (1993). Moreover, neither court had the mental health records before it to make the determination whether the records were privileged in the first instance. Thus, neither court found that a violation of the Mississippi evidence rules had occurred.

Further, even if they were illegally obtained, the causal connection between the records and the confession is weak. The confession must be excluded only if, "granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that

---

[7] The Mississippi rules have since been amended to exempt only those disclosures believed necessary to prevent "reasonably certain death or substantial bodily harm." MISS. RULES OF PROF'L CONDUCT 1.6(b)(1) (2009).

illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun*, 371 U.S. at 488 (quotation omitted). Crawford merely alleges that his interlocutor, FBI Agent Joe Jackson, had read the records and consulted with a behavioral science expert prior to the arrest. This is an insufficient causal connection to justify the exclusion urged. A COA on this claim is denied.

**E. Whether the trial court denied Crawford his Sixth Amendment right to an impartial jury by sustaining objections to questioning during voir dire**

During voir dire at Crawford's murder trial, the trial judge sustained the state's objections to certain questions by James Pannell, Crawford's counsel,[8] which sought to elicit prospective jurors' views on the death penalty under particular circumstances. Pannell was prevented from obtaining jurors' views on whether the death penalty ought to be automatic if a crime was committed during a kidnapping or a sexual assault and whether they would consider specific mitigating factors. Pannell was, however, permitted to ask, "Is there any one here that believes that the death penalty ought to be automatic of [sic] someone is found guilty of capital murder." Crawford argues that his due process rights were violated under *Morgan v. Illinois*, 504 U.S. 719 (1992), which held that a capital defendant "must be permitted on *voir dire* to ascertain whether his prospective jurors" would "impose death regardless of the facts and circumstances of conviction." *Id*. at 735-36.

"This circuit has previously stated that *Morgan* only involves the narrow question of whether, in a capital case, jurors must be asked whether they would automatically impose the death penalty upon conviction of the defendant." *Trevino v. Johnson*, 168 F.3d 173, 183 (5th Cir. 1999) (quotation omitted).

---

[8] During trial, Pannell was assisted by David Bell.

Crawford concedes that this question (automatic death) was posed to the venire by his counsel. Moreover, the trial judge also posed this question to the venire and two jurors were removed for cause based on their affirmative responses.

Further, the trial judge asked the venire whether they would consider any mitigating evidence against imposition of the death penalty. The trial judge sustained the state's objection to Pannell's attempt to elicit jurors' views on specific mitigating factors. The *Trevino* court considered a similar claim regarding questioning on a specific mitigating factor and ruled that *Morgan* in no way requires the trial court to permit such questioning. 168 F.3d at 183.

On direct appeal, the Mississippi Supreme Court ruled that "the trial judge conducted sufficient questioning, and combined with the individual examination of jurors, voir dire of the venire was sufficient as to whether anyone would automatically vote to impose death." *Crawford I*, 716 So. 2d at 1043. The district court agreed and denied relief on this claim. Crawford has not made the requisite showing of a denial of a constitutional right, and his request for a COA on this claim is denied.

**F.    Whether the "especially heinous, atrocious or cruel" jury instruction was unconstitutionally vague**

Following the guilty verdict, the trial entered the sentencing phase. In deciding whether to impose the death penalty, Crawford's jury was instructed to consider the potential existence of three aggravating factors. The third of these was that "[t]he capital offense was especially heinous, atrocious or cruel." This factor was further defined as follows:

> The court instructs the jury that in considering whether the capital offense was especially heinous, atrocious or cruel; heinous means extremely wicked or shockingly evil; atrocious means outrageously wicked and vile; and cruel means designed to inflict a high degree of pain with indifference to or even enjoyment of the suffering of others.

14

> An especially heinous, atrocious or cruel capital offense is one accompanied by such additional acts as to set the crime apart from the norm of capital murders — the conscienceless or pitiless crime which is unnecessarily torturous to the victim.
>
> If you find from the evidence beyond a reasonable doubt that the defendant utilized a method of killing which caused serious mutilation, that there was dismemberment of the body prior to death, that the defendant inflicted physical or mental pain before death, that there was mental torture and aggravation before death, or that a lingering or torturous death was suffered by the victim, then you may find this aggravating circumstance.

Crawford argues that this instruction failed to adequately narrow the kinds of killings which may warrant the death penalty. He contends that *Maynard v. Cartwright*, 486 U.S. 356 (1988), and *Shell v. Mississippi*, 498 U.S. 1 (1990) (per curiam), invalidated similar instructions and that accordingly his death sentence should be reversed.

The district court noted that multiple Supreme Court decisions had approved language similar to that employed in the instruction given. In *Profitt v. Florida*, for instance, the Court considered a narrowing construction of the same aggravating factor, which limited its application to "the conscienceless or pitiless crime which is unnecessarily torturous to the victim." 428 U.S. 242, 255 (1976) (quotation omitted). The Court concluded that the construction did not "provide[] inadequate guidance to those charged with the duty of recommending or imposing sentences in capital cases." *Id.* at 256; *see also Bell v. Cone*, 543 U.S. 447, 457-58 (2005) (rejecting a vagueness challenge to the state court's narrowing construction of the same aggravating factor).

Crawford cites Justice Marshall's concurring opinion in *Shell v. Mississippi*, which stated that an attempt to define "especially heinous, atrocious

15

or cruel" using some of the language employed by the trial court in this case would not pass constitutional muster. 498 U.S. at 2-3 (Marshall, J., concurring).[9] However, Crawford ignores the trial court's further narrowing of the aggravating factor to "the conscienceless or pitiless crime which is unnecessarily torturous to the victim," as mentioned above. This additional limiting construction of the aggravating factor cured any alleged vagueness or overbreadth, and Crawford cites no authority to the contrary. No COA shall issue on this claim.[10]

G.     **Whether the jury instructions failed to make clear that unanimity was not required in order for individual jurors to consider mitigating evidence**

Crawford contends that based on the phrasing of the sentencing instructions, there was a substantial probability that individual jurors believed they could not consider mitigating evidence unless all twelve jurors agreed that a particular mitigating factor applied. In *Mills v. Maryland*, the Supreme Court held that "the sentencer must be permitted to consider all mitigating evidence. The possibility that a single juror could block such consideration, and consequently require the jury to impose the death penalty, is one we dare not risk." 486 U.S. 367, 384 (1988).

The instructions nowhere stated that unanimity was required with respect to the jury's consideration of mitigating factors. They referred to a unanimity

---

[9] The instruction in *Shell* stated: "[T]he word heinous means extremely wicked or shockingly evil; atrocious means outrageously wicked and vile; and cruel means designed to inflict a high degree of pain with indifference to, or even enjoyment of[,] the suffering of others." 498 U.S. at 2 (Marshall, J., concurring) (alterations in original) (quotation omitted).

[10] Crawford's brief asserts in passing that the death in this case did not meet the trial court's definition of "especially heinous, atrocious or cruel." To the extent this contention is premised on an alleged lack of evidence to support the jury's finding of this aggravating factor, the argument is not developed in Crawford's brief and, considering the nature of the killing, does not merit a COA in any event.

requirement only with respect to aggravating factors. Crawford does not identify any specific instruction which even reasonably suggests a unanimity requirement for mitigating circumstances. Instead, he argues that the jury was never instructed that unanimity was *not* required for any particular mitigating factor before it could consider such evidence.

In *Stringer v. Jackson*, this court rejected a similar argument even when the instructions did, as an "oversight," require unanimity for mitigating circumstances. 862 F.2d 1108, 1112 (5th Cir. 1988), *modified on other grounds by Stringer v. Black*, 979 F.2d 38 (5th Cir. 1992). The court held that "a reading of the *entire charge* would not have led the jurors to think they were compelled to ignore mitigating circumstances (unless found unanimously) in determining an appropriate sentence." *Id.* (emphasis added).

In this case, as the district court concluded, the jury instructions, read as a whole, do not require juror unanimity to consider mitigating circumstances. Consequently, a COA is denied on this claim.

**H.** **Whether a jury instruction impermissibly shifted the burden of proof to Crawford by failing to require the jury to find that aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt**

Crawford next challenges the following jury instruction:

> In the event that you find that the mitigating circumstance(s) do not outweigh or overcome the aggravating circumstance(s), you may impose the death sentence. Should you find that the mitigating circumstance(s) outweigh or overcome the aggravating circumstance(s), you shall not impose the death sentence.

Crawford argues that under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002),[11] this instruction was erroneous. First, he contends that the jury was not instructed to find that aggravating circumstances outweighed mitigating circumstances. Later in his brief, he argues that the instruction omitted a reasonable doubt requirement from any potential jury finding that mitigating circumstances did not outweigh aggravating circumstances. His arguments on both fronts are foreclosed.

Crawford points to no authority which mandates that a jury make an affirmative finding that aggravating factors *outweigh* mitigating factors beyond a reasonable doubt. Instead, the cases he cites hold that "the Sixth Amendment requires that [aggravating factors] be *found* by a jury." *Ring*, 536 U.S. at 609 (emphasis added). Moreover, as the district court noted, *Kansas v. Marsh* confirmed "that a state death penalty statute may place the burden on the *defendant* to prove that mitigating circumstances outweigh aggravating circumstances." 548 U.S. 163, 173 (2006) (emphasis added). It follows that a state court's failure to instruct the jury that it must find that aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt does not run afoul of the Sixth Amendment. A COA on this claim is denied.

## I.   Whether the use of kidnapping as both an element of capital murder and an aggravating circumstance violated Crawford's Eighth Amendment rights

---

[11] A criminal defendant is "indisputably entitle[d] . . . to 'a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.'" *Apprendi*, 530 U.S. at 477 (quoting *United States v. Gaudin*, 515 U.S. 506, 510 (1995)). In *Ring*, the Supreme Court overruled that portion of *Walton v. Arizona*, 497 U.S. 639 (1990), that "allow[ed] a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty." 536 U.S. at 609. Instead, the Court concluded, the Sixth Amendment right to trial by jury applied to "the factfinding necessary to put [a defendant] to death." *Id.*

As a prerequisite to Crawford's capital murder conviction, the jury found during its guilt deliberations that Ray's murder occurred during the course of a kidnapping. *See* MISS. CODE ANN. § 97-3-19(2)(e) (1992). During the sentencing deliberations, the jury also found, as an aggravating circumstance, that the killing was committed during the course of a kidnapping. Crawford contends that duplicating an element of the offense as an aggravating circumstance violates the Eighth Amendment.

In *Lowenfield v. Phelps*, the Supreme Court held that a state capital sentencing scheme may narrow the category of death-eligible defendants in either of two ways. 484 U.S. 231, 246 (1988). "The legislature may itself narrow the definition of capital offenses . . . so that the jury finding of guilt responds to this concern, or the legislature may more broadly define capital offenses and provide for narrowing by jury findings of aggravating circumstances at the penalty phase." *Id.*[12] Elaborating on *Lowenfield* in *Tuilaepa v. California*, the Court stated: "To render a defendant eligible for the death penalty in a homicide case, we have indicated that the trier of fact must convict the defendant of murder and find one 'aggravating circumstance' (or its equivalent) at either the guilt or penalty phase." 512 U.S. 967, 971-72 (1994). "The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both)." *Id.* at 972.

---

[12] Crawford's attempt to distinguish the Louisiana statutory framework from the Mississippi framework is unavailing. He contends that, unlike Louisiana, Mississippi does not narrow the class of death-eligible defendants at the guilt phase. This contention is contradicted by MISS. CODE ANN. § 97-3-19 (1992), which distinguishes capital murder from noncapital murder. Sections 97-3-19(2)(a)-(g) set forth the specific circumstances in which a defendant may be convicted of capital murder.

Crawford further contends that all defendants charged with felony murder are eligible for the death penalty in Mississippi. This contention is flatly contradicted by MISS. CODE ANN. § 97-3-19(1)(c), which designates as murder (as opposed to capital murder) any homicide "by any person engaged in the commission of any felony other than" certain enumerated felonies.

Here, the kidnapping element, as a requisite element of a capital murder conviction, was used to render Crawford eligible for a death sentence in the guilt phase. It was then found as an aggravating factor during the sentencing phase to support the jury's actual imposition of the death penalty. This kind of scheme was approved by the *Tuilaepa* Court and is not constitutionally invalid. A COA shall not issue on this claim.

**J.** **Whether the state's failure to disclose an FBI report until after Crawford's trial amounted to a *Brady* violation**

After his murder trial, Crawford's counsel obtained an FBI report through a Freedom of Information Act request. Crawford contends that the state's failure to produce this report, which was created in February 1993, prior to the trial, was a violation of *Brady v. Maryland*, 373 U.S. 83 (1963).[13] According to Crawford, the report had impeachment value and would have supported his theory that he did not lead the search to the body. Had the report been produced, he argues, the jury would have believed his claim that he had no memory of the murder and imposed a life sentence rather than death.

At trial, the defense's theory was that the FBI agents led Crawford to the body, with the assistance of a specialized search aircraft. The state, meanwhile, presented testimony that Crawford led the search effort, with the aircraft merely assisting the searchers to position themselves relative to a nearby landmark. FBI Agent Jackson testified at trial: "We could not have found [Ray's body] in my opinion even with the technical expertise that we had there with the very special equipment that came from Washington. We could not have found her in the time

---

[13] Under *Brady*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. The *Brady* rule extends to impeachment evidence, in addition to exculpatory evidence. *United States v. Bagley*, 473 U.S. 667, 676 (1985).

that was done without [Crawford's] assistance." Meanwhile, the FBI report stated: "[REDACTED] was utilized and was extremely beneficial in guiding the search team to the victim's body. In fact, it was quite possible victim might not have been located that evening without the use of [REDACTED]."[14]

The state court concluded that the FBI report had "little impeachment value, much less the material value required for the grant of a new trial." *Crawford II*, 867 So. 2d at 204. Similarly, the district court found that "Jackson's trial testimony is not in conflict with the F.B.I. report, and the report contains no exculpatory or impeachment evidence." *Crawford III*, 2008 WL 4419347 at *32. The state defends this ruling, arguing that there is no contradiction between the statement in the report and Jackson's testimony.

The report and testimony do not contradict one another. Most important, the report states that "it was quite possible" that Ray's body would not have been found "that evening" without the help of the aircraft. This statement amounts to a possibility that the body could have gone unlocated that evening, rather than a categorical assertion. Meanwhile, Jackson's testimony acknowledged the "aircraft assistance" and "the technical expertise . . . with the very special equipment." Defense counsel did not probe the nature of this assistance on cross-examination.

Moreover, Crawford makes an unconvincing argument with respect to the materiality requirement, *i.e.*, that the result of the sentencing phase would have been different had the FBI report been disclosed to the defense. *See Bagley*, 473 U.S. at 682. Considering the lack of contradiction between his testimony and the

---

[14] Certain portions of the FBI report were apparently redacted pursuant to 5 U.S.C. § 552(b)(7)(E), which exempts records or information whose release to the public "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." No party disputes that these redacted portions refer to the specialized search aircraft.

report, Crawford has not shown a reasonable possibility that the jury would have been persuaded that he could not recall the murder if the report had been disclosed. A COA on this claim is denied.

## K. Ineffective assistance of trial counsel

Crawford makes eight ineffective assistance claims against his trial counsel. These claims are all governed by the framework established in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail, Crawford must establish: (1) "that counsel's representation fell below an objective standard of reasonableness"; and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

*(1) Whether trial counsel was ineffective for failing to develop a meaningful attorney/client relationship*

Crawford claims that his trial counsel, Pannell, was ineffective because he did not establish a "relationship of trust" with his client. Crawford cites no authority for the proposition that a criminal defendant is entitled to a "meaningful" relationship with counsel or that the denial of such a relationship amounts to ineffective assistance of counsel. Further, in *Morris v. Slappy*, the Supreme Court explicitly "reject[ed] the claim that the Sixth Amendment guarantees a 'meaningful relationship' between an accused and his counsel." 461 U.S. 1, 14 (1983). No COA shall issue on this claim.

*(2) Whether trial counsel was ineffective for failing to investigate critical aspects of Crawford's insanity defense*

Crawford makes several allegations about the deficiencies of his expert witnesses, arguing that his counsel failed to prepare them for trial. He contends that his experts' diagnoses were conflicting and further contends that those experts were unfamiliar with the case as a result of his counsel's failure to

22

prepare them. Other than a conclusory assertion, however, Crawford fails to show how his counsel is responsible for the alleged inadequacies of and conflicts in his experts' testimony.

In any event, the experts' testimony was not deficient. During the guilt phase and the sentencing phase, Dr. Stanley Russell testified that Crawford suffered from psychogenic amnesia. During the sentencing phase, Dr. Martin Webb testified that Crawford suffered from manic depressive illness. Webb admitted that his diagnosis differed from Russell's, but did not characterize Russell's diagnosis as incorrect. Russell, meanwhile, acknowledged his disagreement with Webb's diagnosis but noted that it "is not unusual for psychiatrist[s] to disagree." As the district court noted, the defense's purpose at the sentencing phase was to present mitigating evidence, rather than to establish an insanity defense. Presenting evidence of two alleged mental illnesses afflicting Crawford did not prejudice the case for mitigation.

Crawford further argues that counsel's failure to prepare the experts left them unfamiliar with the facts of the case and constituted ineffective assistance of counsel. He points to Russell's inability to recall specific facts surrounding the killing as support. However, Russell stated that any information that he had not considered was irrelevant to his psychogenic amnesia diagnosis. Crawford also argues that Webb had not read the FBI reports, but fails to explain how this fact prejudiced his mitigation case such that the result would have been different if Webb had read those reports.

Finally, Crawford makes no persuasive argument concerning *Strickland*'s prejudice prong. A COA is denied on this claim.

*(3)    Whether trial counsel was ineffective for failing to seek a competency evaluation prior to trial*

Crawford alleges that his counsel was ineffective for failing to request a competency hearing prior to trial.[15]   The basis for Crawford's claim is the affidavit of Dr. Lemly Hutt, dated May 17, 1993, which opines that he was probably incompetent to stand trial.

In the unrelated rape and assault case, Hutt examined Crawford on an ongoing basis prior to February 1993 for his competency to stand trial on those charges.  During that time, Hutt found Crawford competent.  On May 2, 1993, Crawford suffered a seizure while incarcerated.  As a result, Crawford was prescribed and began taking Dilantin, an antiepileptic/antiseizure drug.  In Hutt's opinion, excess Dilantin caused grogginess and incoherence, which counsel had observed in Crawford.  Reducing the Dilantin dose, meanwhile, posed the risk of future seizures.

Hutt did not have the opportunity to reexamine or observe Crawford following the seizure.  Hutt nevertheless opined that "there is a probability that he is currently incompetent to stand trial."  He noted that he was "unable to assess [Crawford's] competency to stand trial with certainty" without an opportunity to reexamine Crawford and review test results.

The district court agreed with the state court's determination that defense counsel was deficient for failing to seek a competency determination.  However, the district court upheld the state court's ruling that Crawford suffered no prejudice as a result and that, therefore, there was no ineffective assistance of counsel.  Although counsel may have been deficient in failing to seek a competency determination, there is no evidence of resulting *Strickland*

---

[15] Crawford's brief also alleges that "counsel was ineffective for failing to litigate the issues surrounding Petitioner's competency to stand trial."  Crawford's brief is unclear about what "issues," other than whether to request a hearing, were handled ineffectively.

prejudice. Critically, Crawford musters no evidence that he was actually incompetent to stand trial due to the effect of his Dilantin medication. Further, Russell, the defense's expert, expressly testified that Crawford was competent to stand trial. Crawford offers nothing to disturb the district court's and state court's view of the evidence that he was competent to stand trial. Absent such a showing, Crawford is unable to meet *Strickland*'s prejudice prong. A COA is denied on this claim.

(4)     *Whether trial counsel was ineffective for conceding Crawford's guilt during*
        *his opening statement*

During his opening statement, Pannell told the jury about the "escalating nature of [Crawford's] problems" and "his level of violence directed at women." Crawford contends that these statements amounted to a concession of guilt without his approval, which constitutes ineffective assistance of counsel. As the district court determined, however, counsel may have conceded that Crawford committed certain acts and had certain tendencies, but persisted in arguing that he was not guilty by reason of insanity. Crawford provides no authority for his position that mentioning a client's mental state or admitting that he committed certain acts amounts to a concession of guilt when counsel is presenting an insanity defense. A COA is denied on this claim.

(5)     *Whether trial counsel was ineffective for introducing prejudicial evidence*
        *of a ransom note during presentation of Crawford's case*

During Crawford's case-in-chief, Pannell called Crawford's former counsel, William Fortier, to explain why he had turned over Crawford's medical records to the FBI. Pannell was attempting to show that those medical records were obtained under false pretenses. On cross-examination, Fortier discussed a ransom note found in the attic of Crawford's family home. Crawford contends that by introducing this line of questioning, Pannell sabotaged his insanity defense by opening the door to evidence of premeditation in the form of the

25

ransom note. He further argues that the disclosure of the ransom note negated Dr. Russell's testimony regarding Crawford's psychogenic amnesia.

The ransom note evidence was made admissible under state law because Crawford mounted an insanity defense. *See McLeod v. State*, 317 So. 2d 389, 391 (Miss. 1975) ("When the defense is insanity, either general or partial, the door is thrown wide open for the admission of evidence of every act in the accused's life relevant to the issue of insanity and is admissible in evidence. The trial court is to be liberal in allowing the introduction of evidence or examination of witnesses which tends to show the insanity or sanity of the accused."). Crawford does not make a credible argument that the ransom note was introduced solely because Pannell threw open the door by questioning Fortier about disclosing Crawford's medical records. The note, as premeditation evidence, was already admissible on the basis of Crawford's affirmative defense. A COA is denied on this claim.

*(6)    Whether trial counsel was ineffective for presenting an inadequate closing argument following the guilt phase*

During his closing argument, Pannell told the jury, *inter alia*, that "there is no woman that is safe because that's where [Crawford's] rage is directed" and that "everybody is in danger." As with counsel's opening statement, Crawford contends that this amounted to an admission of guilt without his approval, which constitutes ineffective assistance of counsel. Although counsel may have admitted the commission of certain acts and even conceded that Crawford posed certain dangers, these arguments were intended to support the insanity defense. No COA shall issue on this claim.

*(7)    Whether trial counsel was ineffective for failing to investigate and present significant mitigating evidence*

Crawford asserts that counsel failed to investigate and present certain mitigating evidence during the sentencing phase of the trial. He claims that

counsel failed to investigate and present evidence of his "emotional and mental disturbances, physical and mental abuse, adaptation to prison conditions, remorse, and substance abuse," and that these omissions may have affected the jury's decision to impose a death sentence. He points to pretrial correspondence from Deirdre Enright, an attorney at the Capital Defense Resource Center, to Pannell, Webb, and Enright's colleague Jim Craig. Enright apparently conducted interviews with family members and associates of Crawford and constructed a written narrative centered upon his emotional and mental disturbances.

In *Wiggins v. Smith*, the Supreme Court set forth the standard for evaluating a trial attorney's investigation into mitigating evidence. 539 U.S. 510, 522-23 (2003). "[W]e focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background was itself reasonable. In assessing counsel's investigation, we must conduct an objective review of their performance, measured for 'reasonableness under prevailing professional norms,' which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" *Id.* at 523 (citations omitted) (quoting *Strickland*, 466 U.S. at 688, 689).

On collateral review, the Mississippi Supreme Court found that Crawford did not allege the existence of any evidence that was outside of counsel's knowledge. In other words, Crawford presented nothing which would impugn the sufficiency of Pannell's investigation. The state court therefore concluded that there was no basis to even analyze whether counsel had conducted an adequate investigation. *Crawford II*, 867 So. 2d at 218. In his brief to this court, Crawford concedes that the results of Enright's interviews were provided to

27

Pannell and does not otherwise highlight any evidence that Pannell failed to discover.[16] He has not shown that Pannell's investigation was deficient.

Crawford also claims that Pannell failed to present certain mitigating evidence. As discussed, the state court, lacking evidence to the contrary, presumed that Pannell's investigation was a complete one. It accordingly treated his decisions about which evidence to present as within the ambit of trial strategy and therefore entitled to "great deference." *Crawford II*, 867 So. 2d at 218. Meanwhile, the district court found that the jury had the benefit of testimony concerning Crawford's evaluations at various mental health facilities, unstable upbringing, night terrors, memory lapses, mood swings, headaches, fear of the dark, and unusual behavior coloring photos of women's faces. The district court then determined that Crawford had not substantiated his remaining allegations of adaptation to prison conditions, remorse, physical abuse, or organic brain damage. *Crawford III*, 2008 WL 4419347, at *50.

In *Strickland*, the Supreme Court held that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U.S. at 690-91; *see also Taylor v. Maggio*, 727 F.2d 341, 347-48 (5th Cir. 1984) ("[T]he failure to present a particular line of argument or evidence is presumed to have been the result of strategic choice."). The state court determined that counsel's investigation was a thorough one, and Crawford offers little to overcome the *Strickland*

---

[16] Crawford cites the affidavit of Marion Ray Crawford, Charles Crawford's father, who stated that defense counsel "did not interview members of the family until the morning of . . . trial." Crawford, however, cites no authority for the proposition that Pannell needed to have conducted in-person interviews, rather than rely on the reports of Enright. Assuming *arguendo* that Pannell's sole contact with family members was on the morning of trial, it does not necessarily follow that he failed to discover mitigating evidence from them.

presumption that Pannell's decisions were "strategic choices." Even when counsel "might have done more to highlight particular portions of [a defendant's] social history in an effort to elicit more sympathy from the jury," this court has found such a performance "within the wide range of reasonable professional assistance." *Ries v. Quarterman*, 522 F.3d 517, 529 (5th Cir. 2008). Crawford has not shown that trial counsel was deficient in failing to present certain mitigating evidence. A COA is denied on this claim.

(8)     *Whether trial counsel was ineffective for failing to seek a continuance before the sentencing phase*

Finally, Crawford argues that counsel was ineffective in failing to secure a limited continuance prior to the sentencing phase. He claims that counsel only had ten minutes to prepare for the sentencing phase and was, by his own admission, "exhausted." Crawford contends that a continuance would have enabled counsel to prepare more effectively for the sentencing phase.

A review of the record shows that Crawford conflates two different moments from the trial. Following the return of the guilty verdict, counsel for the state indicated that he needed ten minutes to prepare for the sentencing phase. Crawford's counsel voiced no objection to proceed to the sentencing phase within that time frame. The record shows that counsel stated he was "exhausted" *following* the sentencing phase testimony, not before it began. The exhaustion comment was part of an argument to continue further proceedings, including a jury charge conference and closing arguments, until the following morning. The trial judge accepted this argument and, over the state's objection, adjourned until the following morning.

The record shows no reason for counsel to have sought a continuance prior to the sentencing phase. To the extent Crawford claims counsel should have done so due to exhaustion, he has misread the record. A COA is denied on this claim.

**CONCLUSION**

For the foregoing reasons, we GRANT Crawford a COA on his claim that he was subjected to a psychiatric evaluation of his competency without the benefit of counsel in violation of the Sixth Amendment. To permit the district court an opportunity to develop the record, if necessary, and reconsider the merits of Crawford's claim, we VACATE that portion of its order denying relief on this basis and REMAND for further proceedings. Crawford's motion for a COA is DENIED in all other respects.