# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2013-DR-02147-SCT

*CHARLES RAY CRAWFORD a/k/a CRAWFORD, CHUCK*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/12/1998 |
| TRIAL JUDGE: | HON. R. KENNETH COLEMAN |
| TRIAL COURT ATTORNEYS: | JAMES PANNELL |
| | DAVID O. BELL |
| COURT FROM WHICH APPEALED: | TIPPAH COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | MISSISSIPPI OFFICE OF CAPITAL POST-CONVICTION COUNSEL |
| | BY: LOUWLYNN VANZETTA WILLIAMS |
| | ALEXANDER D. KASSOFF |
| | CHARLES RAY CRAWFORD (PRO SE) |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: MARVIN L. WHITE, JR. |
| DISTRICT ATTORNEY: | BENJAMIN F. CREEKMORE |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - POST-CONVICTION |
| DISPOSITION: | POST-CONVICTION RELIEF DENIED - 08/04/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**WALLER, CHIEF JUSTICE, FOR THE COURT:**

¶1.     This matter comes before the Court on Charles Ray Crawford's Application for Leave to File Successive Petition for Post-Conviction Relief attacking his conviction for capital murder and death sentence. Also before the Court are the Response filed by the State of

Mississippi and Crawford's pro se Application for Leave to File Successive Petition for Post-Conviction Relief. After review, we deny both Crawford's application for leave to proceed and his pro se application for leave.

## FACTS AND PROCEDURAL HISTORY

¶2.    Crawford's main issue in this successive petition for post-conviction relief focuses on Crawford's first post-conviction relief (PCR) counsel's failure to obtain expert assistance and subject Crawford to further mental evaluations.

¶3.    Charles Crawford was out on bond and awaiting trial on charges based on events alleged to have occurred in January 1991. These charges were unrelated to the instant capital-murder charge. Crawford had filed a notice of intent to plead an insanity defense for both charges. In December 1992, Crawford was subjected to a psychiatric examination at the Mississippi State Hospital by Dr. Criss Lott, a clinical psychologist, and Dr. Reb McMichael, a psychiatrist and director of the Forensic Sciences Unit. Both doctors concluded that Crawford had no memory deficits, that he was in fact malingering (i.e., faking) his memory deficits, that he could distinguish right from wrong, and that he was competent to stand trial.

¶4.    In January 1993, four days before his trial for the unrelated charges of aggravated assault and rape was set to begin, Crawford broke into the home of Kristy Ray, kidnapped her, left a ransom note, and took her to a secluded barn in the woods. Crawford then raped and killed her. After the police arrested Crawford, he admitted to murdering Kristy, and he escorted law enforcement to the location of Kristy's body. The next day, Crawford gave a more detailed account of the kidnapping and murder to the FBI. Crawford stated he was

2

worried about his upcoming rape and aggravated-assault trial, and he had wanted to be alone. So he went out to the barn known as Hopper Barn, armed with a shotgun, knife, and revolver. He had been stockpiling food and drink for nearly a month.

¶5. He claimed to have had two blackouts, one immediately before abducting Kristy, and one before her death. Crawford described everything he claims he could remember and that after he awoke from the second blackout, Kristy was dead at his feet. Crawford said he must have killed Kristy, but he could not remember doing so. He told the investigators that he sometimes had blackouts and could not control himself.

¶6. At least five experts had evaluated Crawford before trial. Crawford presented the insanity defense through the testimony of several family members and Dr. Stanley Russell, a psychiatrist with the Mississippi Department of Corrections. *Crawford v. State*, 716 So. 2d 1028, 1036 (Miss. 1998) (*Crawford I*), *superseded by rule on other grounds as stated in* *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 39 (Miss. 2003). Dr. Russell had treated Crawford while at Parchman. *Id.* For a period of ten months before trial, Dr. Russell had seen Crawford three times a week. Dr. Russell testified that, in his opinion, at the time the subject crime was committed, Crawford was insane under *M'Naghten*[1]:

> Crawford suffered from depression and periods of time lapse about which he has no memory. Russel[l] diagnosed Crawford as a psychogenic amnesiac. Russel[l] referred to the prior medical history of Crawford, including medication prescribed by a psychiatrist when Crawford was ten, his hospitalization in East Mississippi State Hospital in 1989, his hospitalization at a psychiatric facility in Memphis in 1991 and two forensic evaluations at Whitfield. Crawford had been diagnosed with bipolar disorder (manic depressive illness) in 1989, and he had been prescribed lithium, which seemed

---

[1] *See* ***M'Naghten's Case***, 8 Eng. Rep. 718, 10 Cl. & Fin. 200 (1843).

to calm the moods of manic people. Russel[l] also testified regarding Crawford's anger and resentment as a child and his antisocial behavior as a teenager. Russel[l] ultimately testified that in his opinion Crawford satisfied "the *M'Naghten* test for not being criminally responsible for his actions as a result of mental disorder that affected his reasoning to the point that he was not aware of the nature and consequence of his behavior."

*Id.* at 1036.

¶7.    Dr. Russell stated that he had consulted at least two other experts who agreed with his conclusions that Crawford had suffered from psychogenic amnesia. These experts included Dr. Don Guild with the Forensic Unit at the State Hospital, and Dr. Daphne Simion, Director of the Dissociative Disorders Program at Queens Hospital in New York, New York. Two expert witnesses also testified for the defense at the sentencing phase–Dr. Russell again and Dr. Mark Webb, a psychiatrist in private practice hired by Crawford's family. *Id.* at 1052. Dr. Webb had testified about Crawford's history of head injuries at the sentencing phase. Dr. Webb testified that he believed Crawford suffered from bipolar disorder and lacked criminal responsibility at the time of the trial. *Crawford v. Epps*, 2012 WL 3777024 (N.D. Miss. Aug. 29, 2012). Dr. Lemly Hutt, also hired by Crawford's family, had evaluated Crawford. But the defense did not call him as a witness.[2]

¶8.    Rebuttal testimony was presented by Drs. Lott and McMichael. These experts indicated that Crawford suffered from no major mental illness and they found that Crawford

---

[2] Defense counsel also called the following witnesses to testify in mitigation: Marion Ray Crawford, father; Dewey Crawford, grandfather; Chlois Crawford, grandmother; Johnny Rush Smith, mother; John Lee Montgomery, grandfather; Martha Montgomery, grandmother; Martha Crawford, stepmother; Clint Crawford, half-brother; and Rebecca Crawford, sister. *Crawford v. Epps*, 2008 WL 4419347, **48-50 (N.D. Miss. Sept. 25, 2008), *vacated in part by Crawford v. Epps*, 353 Fed. App'x 977 (5th Cir. 2009).

had malingered his memory problems. By the time of the capital murder trial, Drs. Lott and McMichael had evaluated Crawford on four separate occasions related to the rape, assault, and capital-murder charges.

¶9.     A jury in the Circuit Court of Tippah County convicted Crawford for capital murder (a killing during the commission of a kidnapping), rape, sexual battery, and burglary. *Crawford I*, 716 So. 2d at 1028. The jury sentenced him to death for the capital-murder conviction, and this Court affirmed his convictions and sentences on direct appeal. *Id.* Crawford's motion for rehearing was denied. The United States Supreme Court denied Crawford's petition for certiorari. *Crawford v. Mississippi*, 525 U.S. 1021, 119 S. Ct. 550, 142 L. Ed. 2d 458 (1999). Subsequently, Crawford's motion for rehearing was denied. *Crawford v. Mississippi*, 525 U.S. 1172, 119 S. Ct. 1100, 143 L. Ed. 2d 99 (1999).

¶10.    Crawford filed his pro se petition for post-conviction relief in this Court. This Court remanded the post-conviction proceedings to the Tippah County Circuit Court for appointment of Crawford's counsel. The circuit court then appointed Thomas C. Levidiotis. Levidiotis filed a petition for post-conviction relief. In order to conduct a thorough investigation into Crawford's claims, Levidiotis also requested that the trial court grant him funding for expert assistance related to mitigation specialist Dr. Gary Mooers to provide, among many services, suggested testing in medical fields based on the mitigation investigation. The circuit court denied his request.

¶11.    After this denial, Levidiotis filed a petition for interlocutory appeal with this Court to appeal the circuit court's order denying his request for funding for expert assistance. A panel

of this Court denied his petition on August 1, 2002, finding that Crawford had failed to show that the appointment of a mitigation investigator was necessary.

¶12. After filing the petition on Crawford's behalf, Levidiotis ultimately withdrew from representation after a dispute as to compensation. The circuit court then appointed the Mississippi Office of Capital Post-Conviction Counsel ("MOCPCC") to review the case and file a supplement. William Clayton, a staff attorney in that office, worked on Crawford's petition. At the same time as his petition for post-conviction relief, Crawford filed an application for leave to file a motion to vacate the judgment and death sentence.

¶13. This Court denied both the petition for post-conviction relief filed by Levidiotis and the supplement filed by the MOCPCC. *Crawford v. State*, 867 So. 2d 196 (Miss. 2003) (*Crawford II*). Crawford then exhausted potential federal habeas remedies, and the United States Supreme Court denied certiorari. *See Crawford v. Epps*, 531 Fed. App'x 551 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 1281, 188 L. Ed. 2d 313 (2014). Now, twelve years after his first petition for post-conviction relief was denied by this Court, and in response to the State's motion to set an execution, Crawford seeks leave to file a successive petition for post-conviction relief in the circuit court.

¶14. Crawford, through the MOCPCC, raises the following issues: (1) whether Crawford received ineffective assistance of first post-conviction-relief counsel for failing to conduct an adequate investigation into Crawford's claims, (2) whether trial counsel was ineffective in presenting evidence related to Crawford's mental state, so that the jury did not hear about Crawford's untreated epilepsy and brain trauma, (3) whether Crawford's right to counsel was

violated in 1993 when his then-attorney assisted law enforcement, agreed to a mental evaluation, and then withdrew from the case, (4) whether Crawford received ineffective assistance of counsel due to trial counsel's failure to suppress evidence used against him in the penalty phase, and (5) whether newly discovered evidence shows that law enforcement ignored Crawford's assertion of his Fifth-Amendment right to counsel.[3]

¶15. Additionally, in Crawford's pro se application for leave, he raises the following issues: (1) whether trial counsel provided constitutionally ineffective assistance by choosing an insanity defense without investigating the possibility that the State had relied on falsified evidence, and (2) whether Crawford was deprived of a fair trial because the State had relied on falsified evidence.

## STANDARD OF REVIEW

¶16. In considering a successive motion seeking post-conviction collateral relief, this Court will:

> deny relief unless the claims are not procedurally barred and they make a substantial showing of the denial of a state or federal right. Miss. Code Ann. § 99–39–27 (Supp. 2011). Absent an applicable exception, a successive motion for post-conviction relief is procedurally barred. Miss. Code Ann. § 99–39–[27(9)] (Supp. 2011); **Rowland v. State**, 42 So. 3d 503, 507 (Miss. 2010).

---

[3] At the time Crawford filed this motion for leave to file this successive petition for post-conviction relief, Crawford's appeal of his prior conviction for rape was still pending in this Court. He argued that vacating this conviction would entitle him to a new sentencing hearing. However, we affirmed his conviction of rape and sentence. **Crawford v. State**, 192 So. 3d 905 (Miss. 2015), *cert. denied* (U.S. June 27, 2016) (No. 15-9425). Thus, this issue will not be addressed.

*Havard v. State*, 86 So. 3d 896, 899 (Miss. 2012) (quoting *Knox v. State*, 75 So. 3d 1030, 1036 (Miss. 2011)). If the claims are not procedurally barred,

> The standard of review for capital convictions and sentences is "one of 'heightened scrutiny' under which all bona fide doubts are resolved in favor of the accused." *Flowers v. State*, 773 So. 2d 309, 317 (Miss. 2000) (citations omitted). "This Court recognizes that 'what may be harmless error in a case with less at stake becomes reversible error when the penalty is death.'" *Id.*

*Chamberlin v. State*, 55 So. 3d 1046, 1049–1050 (Miss. 2010).

¶17.    Under the post-conviction-relief statute, we are authorized to review the merits. We are allowed to "grant or deny any or all relief requested in the attached motion" if "sufficient facts exist from the face of the application . . . ." Miss. Code Ann. § 99-39-27(7)(a) (Rev. 2015); *Hymes v. State*, 703 So. 2d 258, 260 (Miss. 1997). Alternatively, we may allow the filing of the motion in the trial court. Miss. Code Ann. § 99-39-27(7)(b); *Hymes*, 703 So. 2d 258, 260 (Miss. 1997); *Jackson v. State*, 732 So. 2d at 189-90.

¶18.    Crawford's "claim that he was denied the effective assistance of post-conviction counsel during his original PCR proceedings must be addressed first." *Grayson v. State*, 118 So. 3d 118, 125 (Miss. 2013). This Court has recognized that a petitioner under sentence of death possesses the right to effective representation in post-conviction proceedings. *Grayson*, 118 So. 3d at 126 (citing *Jackson v. State*, 732 So. 2d 187, 191 (Miss. 1999); *Chamberlain*, 55 So. 3d at 1049). PCR counsel's deficient performance cannot preclude the petitioner's opportunity to file meritorious claims for relief. *Grayson*, 118 So. 3d at 128. If this right was violated, then Crawford's "first PCR motion was a sham, and he was denied an opportunity to present a meritorious PCR motion." *Grayson*, 118 So. 3d at 126.

The test for ineffective assistance of counsel is well-settled. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). In order to prevail on an ineffective-assistance-of-counsel claim, a defendant must first prove that his counsel was deficient, which requires showing that "counsel made errors so serious that [he or she was] not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674. Secondly, a defendant must prove that the "deficient performance prejudiced the defense," which requires showing that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* Absent both showings, a defendant may not prevail on his claim that his counsel was ineffective. *Id.*

This Court must " 'strongly presume that counsel's conduct falls within a wide range of reasonable professional assistance, and the challenged act or omission might be considered sound trial strategy. In other words, defense counsel is presumed competent.' " *Liddell v. State*, 7 So. 3d 217, 219–20 (Miss. 2009). And even where professional error is proven, this Court must determine if there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Mohr v. State*, 584 So. 2d 426, 430 (Miss.1991).

*Grayson*, 118 So. 3d at 126 (quoting *Chamberlin*, 55 So. 3d at 1050).

## ANALYSIS

I.  **Whether Crawford received ineffective assistance of first post-conviction counsel for failing to conduct an adequate investigation into Crawford's claims.**

¶19.    Crawford argues he has presented sufficient information to conclude that his first post-conviction counsel ("first PCR") provided objectively unreasonable representation. Crawford cites *Grayson v. State*, in which this Court recognized the right to effective post-conviction counsel in death-penalty cases and detailed the errors which constituted counsel's deficient performance:

9

Ryan described how the MOCPCC [Mississippi Office of Capital Post-Conviction Counsel] was understaffed, underfunded and overworked . . . . He stated that minimal, if any, investigation, research, and evaluation were conducted prior to filing the PCR petitions. Ryan stated that, as of January 2003—about one month before Grayson's PCR petition was due—he was the only attorney employed by the MOCPCC and had done nothing in Grayson's case.

. . .

These affidavits reveal that minimal investigation into Grayson's PCR claims was conducted a few days before the PCR motion was due. The only investigation conducted prior to filing the petition were a few phone calls to jurors who would not discuss the case, one request for records—which were not received—and brief interviews with and affidavits from four of Grayson's family members. The MOCPCC did not conduct any independent discovery or investigation and did not seek expert assistance. Counsel for Grayson did not obtain the files from the prosecutor, from law enforcement, or from the State's experts, even though counsel was entitled to these files pursuant to Rule 22(c)(4)(ii) of the Mississippi Rules of Appellate Procedure. Trial counsel was never interviewed. Even though the Court allowed sixty additional days to file a supplemental PCR, no additional investigation was conducted. This Court found the issues raised in the PCR pleadings were "virtually identical" to those asserted on direct appeal. This Court noted the lack of evidentiary support for many of the claims.

*Id.* at 127–28 (internal citations omitted).

¶20. Crawford argues that he never had an opportunity to present a meaningful post-conviction petition to this Court. He alleges his first PCR counsel filed incomplete pleadings, did not obtain any expert assistance, and failed to conduct an investigation into the capital crime and Crawford's background and family. Crawford argues that, despite first PCR counsel recognizing the need for mental-health experts, medical and psychosocial records, and interviews with family members and other witnesses, first PCR counsel did not have Crawford evaluated by any mental-health experts, did not obtain all of Crawford's records,

10

and interviewed only Crawford, his father, and trial counsel. But Crawford's main claim here is that his first PCR counsel failed to investigate new psychological-evaluation evidence, evidence that his first PCR counsel knew his trial counsel had not investigated.

¶21.    Levidiotis was appointed by the circuit court to represent Crawford in the preparation of his first petition for post-conviction relief. Crawford has provided an affidavit from Levidiotis, explaining that he lacked adequate time and funds to investigate Crawford's claims and prepare his petition. Levidiotis states that he "was unable to conduct any mitigation investigation for Mr. Crawford's post-conviction petition." His primary grievance is not having the assistance of Dr. Gary Mooers to assist in the investigation of Crawford's psychiatric problems. Levidiotis states that:

> I knew that I would need to identify additional mental health experts to evaluate Mr. Crawford, and intended to rely on *Gary Mooers* to make this determination. I also needed to develop a comprehensive psychosocial history of Mr. Crawford, and intended to have *Gary Mooers* do the work necessary to develop that history. The particular issue I believe was key to developing a mitigation case was uncovering Mr. Crawford's true psychiatric problems and his reasons for suppressing memories. However, *because the circuit court denied my request for expert funds, I was unable to retain Dr. Mooers and additional mental health experts to conduct a complete evaluation of Mr. Crawford.*

(Emphasis added.)

¶22.    Levidiotis, on interlocutory appeal, requesting funds for expert assistance, had described the extensive investigation needed to determine if there was evidence that should have been submitted to the jury by Crawford's trial counsel. He specifically stated that Crawford's trial counsel had made small attempts to find documents related to Crawford's psychosocial history and organic brain damage. As a result, he stated, Dr. Webb and Dr.

11

Russell did not have the records or time to evaluate Crawford's mental status fully. He argued this case required a full investigation into documents that should have been presented by way of mitigation evidence at the sentencing phase of Crawford's death-penalty case.

¶23.    After Levidiotis withdrew, the MOCPCC was appointed to represent Crawford. Clayton, a staff attorney in that office, worked on Crawford's petition. In his affidavit, Clayton stated that:

> [d]ue to severe staffing and resource shortages, the office was drowning in work when I started to work there . . . . I had to manage an excessive caseload with very limited resources and virtually no professional litigation support, including the use of experts . . . . Our office needed to do an investigation and supplement the PCR to ensure that all of Mr. Crawford's post-conviction claims were developed and properly plead[ed]. Although the MOCPCC had Mr. Crawford's case for several months prior to my arrival, it did not appear that any significant work had been done on the case by the time I started work on it . . . a crushing caseload, staff turnover, time limitations, and inadequate investigative and expert resources prevented me from conducting an adequate investigation and filing a complete supplement to Mr. Crawford's PCR. I recall that I made one trip to Mr. Crawford's home town to meet with his father, and I also met with Mr. Crawford on about two occasions . . . to the best of my knowledge, the MOCPCC did not attempt to obtain Rule 22 discovery . . . the MOCPCC did not conduct any juror interviews. I spoke to Mr. Crawford's father on a few occasions, and our office may have interviewed one other family member.

¶24.    Based on these affidavits, Crawford argues that no meaningful difference exists between the performance of *Grayson*'s counsel and that of Crawford's first PCR counsel. Crawford also argues that *Crawford II*, our opinion denying Crawford's initial post-conviction petition, identifies the deficient performance first PCR counsel provided.[4] One

---

[4] *Crawford II*, 867 So. 2d at 208–10 (Crawford "has failed to include an affidavit from any expert which states what exculpatory testimony they would have provided were Crawford able to afford it"; "he cites no authority for the proposition that any of his counsel's efforts in these regards have fallen below any kind of standard"; "Crawford makes

12

passage from that opinion states that Crawford's first PCR counsel "failed to even allege any information outside of the knowledge of counsel, much less provide the necessary affidavits of such. With such a glaring lack of evidence by which to determine if Crawford was prejudiced, there is no need to even examine the reasonableness of [trial] counsels' investigation." *Crawford II*, 867 So. 2d at 218.

¶25.    An ineffectiveness challenge based on Crawford's first PCR counsel's failure to investigate must focus on whether counsel's decision to forego certain investigation was reasonable. *Doss v. State*, 19 So. 3d 690, 695 (Miss. 2009) (quoting *Strickland v. Washington*, 466 U.S. 668, 690–91, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). Crawford argues that where, as here and in *Grayson*, first PCR counsel failed to investigate information which counsel knows is necessary adequately to present the petitioner's claims, the investigation cannot be deemed reasonable.

¶26.    But the very issue of expert assistance already was asked and answered in prior proceedings. Before Levidiotis withdrew as Crawford's first PCR counsel, he had asked the trial court for expert funding. The trial court denied his request. Levidiotis then filed a petition for interlocutory appeal with this Court. A three-justice panel of this Court–consisting of Presiding Justice McRae, Justice Easley, and Justice Graves–entered an

---

a general assertion that 'counsel failed to ensure that a proper investigation take place.' However, he states nothing more and does not allege what counsel did or failed to do in investigating"; "This would have put Crawford and counsel for this petition on notice as to the levels of Dilantin that Crawford may have been on, yet there is no affidavit provided in the petition as to the effects of such a dosage on Crawford"; "Thus, it is now Crawford's burden to show facts which would have changed since the original determination or to provide an affidavit by a doctor who would have testified as to his incompetency . . . . However, he has not done so.").

order denying his petition and found that Crawford had failed to show that the appointment of a mitigation investigator (Dr. Mooers) was necessary.

¶27.    This Court later denied Crawford's first petition for post-conviction relief. ***Crawford II***, 867 So. 2d at 219. By denying this petition, we implicitly denied all his prayers for relief, one of which requested that we grant "him all the resources necessary to the proper presentation of his case." Thus, any issue related to Levidiotis's investigation of mitigation evidence is barred by res judicata.

¶28.    Additionally, the investigation conducted here is distinguishable from the investigation in ***Grayson***. Crawford had private attorneys and the MOCPCC. In ***Grayson***, PCR counsel had not started until one month before the petition was due. ***Grayson***, 118 So. 3d at 127. Unlike in ***Grayson***, Levidiotis stated in a letter dated March 21, 2000 (ten months before the filing), that "I am making good progress studying the file, have found several potential grounds for post-conviction relief and anticipate filing timely materials in this matter." Levidiotis also billed at least 211 hours in Crawford's case.

¶29.    Levidiotis's admissions in his affidavit that (1) he did not have time to prepare and investigate and (2) his work was incomplete are unavailing. The trial court appointed Levidiotis in January 2000. In January 2001, Levidiotis filed a petition, which was 125 pages long and raised about thirty issues and subissues. The MOCPCC was appointed to file a supplemental petition in May 2002. The supplement was filed in March 2003, containing more than twenty pages and raising four new issues. Levidiotis filed numerous motions during that time frame, including various petitions for interlocutory appeal, motions to

14

sanction the Attorney General, and a motion to have Judy T. Martin removed from the case. All of this negates Levidiotis's assertion that he did not have time to conduct a reasonable investigation.

¶30. An ineffectiveness challenge based on counsel's failure to investigate must focus on whether counsel's decision to forego certain investigation was reasonable. *Doss*, 19 So. 3d at 695. But, as just shown, this Court denied Crawford's first PCR counsel's request for expert funds to conduct further investigation. For these reasons, we find that the performance of Crawford's first PCR counsel was not deficient, and we deny Crawford's successive petition for post-conviction relief.

**II.      Whether trial counsel was ineffective in presenting evidence related to Crawford's mental state, so that the jury did not hear about Crawford's untreated epilepsy and brain trauma.**

¶31. We now examine Crawford's remaining claims. First, we address the claim that trial counsel failed to procure additional neuropsychological testing, as that claim is tied most directly to Crawford's current claim that his first PCR counsel failed to conduct an adequate investigation into the same mental-health issues. Then we will examine Crawford's other three claims, that Crawford argues either were not previously presented or adequately investigated due to his first PCR counsel's deficient representation.

¶32. Crawford must show that his trial counsel's performance was deficient and that the deficiency prejudiced the defense of his case. *Strickland*, 466 U.S. at 686, 104 S. Ct. at 2064, 80 L. Ed. 2d 674. Only then can he succeed on his claim that his first PCR counsel's alleged deficient performance resulted in prejudice.

15

¶33. Crawford claims his trial counsel provided constitutionally ineffective representation by basing Crawford's entire defense in the guilt and sentencing phases of his capital-murder trial on Crawford's psychological health, while simultaneously failing to procure psychological testing that an expert had told counsel before trial was necessary to provide an adequate assessment of Crawford's psychological health. But Crawford's claim that trial counsel failed to obtain a complete psychological evaluation is procedurally barred, as it was raised or was capable of being raised in prior proceedings. This Court has noted:

> Post-conviction relief is not granted upon facts and issues which could or should have been litigated at trial and on appeal. "The doctrine of res judicata shall apply to all issues, both factual and legal, decided at trial and on direct appeal." Miss. Code Ann. § 99-39-21(3) (Supp. 1994). We must caution that other issues which were either presented through direct appeal or could have been presented on direct appeal or at trial are procedurally barred and cannot be relitigated under the guise of poor representation by counsel.

*Foster v. State*, 687 So. 2d 1124, 1129 (Miss. 1996).

¶34. In Crawford's first petition for post-conviction relief, Crawford alleged that his trial counsel had failed in securing adequate funds to conduct a proper investigation and to obtain expert assistance. *Crawford II*, 867 So. 2d at 208. He also claimed that trial counsel had failed to ensure that a proper investigation took place, and he argued that "the insanity defense was ineffectively investigated and presented." *Id.* As to the sentencing phase, Crawford alleged that his trial counsel had failed "to present and investigate significant mitigation evidence." *Id.* at 217.

¶35. This Court denied his petition after concluding that Crawford had not shown that trial counsel was deficient or that any prejudice had resulted. *Id.* at 219. These arguments, which

16

were raised and dismissed in *Crawford II*, are exactly what Crawford argues before us today. Thus, Crawford's claim that trial counsel failed to obtain a complete psychological evaluation is barred by res judicata. Miss. Code Ann. § 99-39-21 (3) (Rev. 2015). However, Crawford argues that this claim is not barred, since his first PCR failed to develop this evidence, and, as a result, this is Crawford's first opportunity to have a court consider his neurological problems.

¶36.    Procedural bar notwithstanding, we will review Crawford's claim that he received constitutionally ineffective assistance because trial counsel failed to investigate Crawford's organic brain damage. An ineffectiveness challenge based on counsel's failure to investigate must focus on whether the decision to forego certain investigation was reasonable. *Doss*, 19 So. 3d at 695. We have stated that "psychiatric and psychological evidence is crucial to the defense of a capital murder case." *State v. Tokman*, 564 So. 2d 1339, 1343 (Miss. 1990) (citing *Ake v. Oklahoma*, 470 U.S. 68, 80, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985)). "[T]here is a critical interrelation between expert psychiatric assistance and minimally effective representation."  *Tokman*, 564 So. 2d at 1343 (citing *Beavers v. Balkcom*, 636 F.2d 114, 116 (5th Cir. 1981); *Wilson v. Butler*, 813 F.2d 664, 672 (5th Cir. 1987); *Greer v. Beto*, 379 F.2d 923, 925 (5th Cir. 1967); *Gray v. Lucas*, 677 F.2d 1086, 1095 (5th Cir. 1982)). Further, though this Court gives deference to counsel's strategic decisions, we have found that "it was unreasonable for counsel not to pursue psychological evidence" when the investigation fails "to follow through on the chosen strategy." *Tokman*, 564 So. 2d at 1344 (citing *Leatherwood v. State*, 473 So. 2d 964 (Miss. 1985)).

17

¶37.   Crawford now has presented affidavits which he claims show trial counsel failed to investigate organic brain damage. One affidavit, dated twenty years ago, is from Dr. Mark Webb who evaluated Crawford and testified for the defense in Crawford's trial, stating that he had informed trial counsel that a full examination would not be complete until a neuropsychological evaluation was conducted on Crawford.[5]

¶38.   Dr. Webb's affidavit states that, before trial, he had stated that "Crawford had a history of head injuries and seizures as well as a history of substance abuse." Dr. Webb had stated that "[a]ll of these things can cause organic brain damage" and that "the presence of brain damage would act as significant mitigating evidence in and of itself since symptoms of organic impairment include perceptual disturbance (misinterpretations, hallucinations), disorientation, personality change, and decreased control over sexual, aggressive, and acquisitive impulses." He also noted that "certain types of brain damage decrease one's ability to control impulses . . . ."

¶39.   Dr. Webb concluded that Crawford should "undergo a neuropsychological battery to determine the existence and extent of any brain dysfunction" and that "until such is done, it cannot be said that Mr. Crawford has had a complete psychological workup." And Dr.

---

[5] We note that this affidavit is dated March 24, 1994, one month before Crawford's trial concluded on April 23, 1994. We are given no context as to what prompted Dr. Webb to produce this affidavit or when he informed trial counsel of this fact. It is interesting that this affidavit has been missing for twenty years during the litigation of this case, as it has not been submitted once in state court or federal habeas proceedings. Further, this affidavit cannot under any circumstance be said to be newly discovered evidence, as Crawford has not shown that it was not available to him at the time of the appeal of this case. *See* Miss. Code Ann. § 99-39-5(2)(a)(i) (Rev. 2015); Miss. Code Ann. § 99-39-27(9) (Rev. 2015).

Webb's affidavit stated that he had informed Crawford's counsel before trial that Crawford needed this testing. But the testing was never done.

¶40. Crawford's trial attorneys also stated that they had failed to obtain a complete psychological evaluation in preparation for trial. James Pannell, Crawford's lead trial counsel, in an affidavit from 2014, stated that:

> Although I used an insanity defense in all three of Mr. Crawford's trials, I did not retain a mental health expert to conduct a forensic evaluation of Mr. Crawford. Instead, I relied on the Parchman psychiatrist, Dr. Stanley Russell, who treated Mr. Crawford during his period of incarceration prior to the capital murder trial, and Dr. Mark Webb, a psychiatrist retained by Mr. Crawford's sister. They gave conflicting assessments and diagnosis of Mr. Crawford . . . . I believe the inadequacies of their evaluations arose because we did not have resources to conduct a thorough and reliable investigation of Mr. Crawford's background.

¶41. Pannell stated that he had "recently been made aware of the neurological and psychiatric examinations done earlier this year." But he made no mention of Dr. Webb's claim that Dr. Webb had informed him before trial that Crawford needed a neurological examination.

¶42. Likewise, David Bell, Pannell's co-counsel, in an affidavit from 2013, stated:

> [W]e did not use the services of a mitigation investigator for this case. We did not file a motion requesting funds to hire a mitigation investigator. Given Mr. Crawford's history of mental health problems, I believe that a detailed and thorough mitigation investigation was critical to adequately prepare for the penalty phase of Crawford's trial.
>
> . . .
>
> [W]e also did not seek funds for or hire a mental health expert or neuropsychologist to evaluate and test Mr. Crawford. I believe this testing and evaluation were necessary, given Mr. Crawford's history, for the defense to adequately prepare for and present the penalty phase of the trial.

19

¶43. In light of these affidavits, Crawford argues we must conclude that he has made a substantial showing that his trial counsel provided objectively unreasonable representation by failing to follow through with an investigation into known evidence necessary to present their chosen trial strategy.

¶44. We disagree. The facts concerning Crawford's mental and psychological evaluation show that trial counsel subjected Crawford to extensive expert testing. At least five experts evaluated Crawford before trial. Crawford presented his insanity defense through the testimony of his treating physician Dr. Russell, a psychiatrist with the Mississippi Department of Corrections. *Crawford I*, 716 So. 2d at 1028. Dr. Russell also had seen Crawford three times a week for ten months before trial. Dr. Russell testified that Crawford was insane under *M'Naghten*. He further testified that Crawford suffered from depression and periods of memory lapse, that he had diagnosed Crawford as a psychogenic amnesiac, and stated that Crawford had been diagnosed with bipolar disorder. *Id.* at 1036.

¶45. Dr. Russell had consulted at least two other experts–one with the Forensic Unit at the State Hospital and another who was the Director of the Dissociative Disorders Program at Queens Hospital in New York–who agreed with Dr. Russell's conclusions that Crawford had suffered from psychogenic amnesia. Dr. Webb had testified about Crawford's head injuries at the sentencing phase, and he also had testified that he believed Crawford suffered from bipolar disorder and lacked criminal responsibility at the time of the trial. *Crawford*, 2012 WL 3777024.[6] Dr. Lemly Hutt also had been retained by the defense. Two more experts, Drs.

---

[6] Defense counsel also called the following witnesses to testify in mitigation: Marion Ray Crawford, father; Dewey Crawford, grandfather; Chlois Crawford, grandmother;

Lott and McMichael, who had evaluated Crawford many times, testified for the State. They concluded that Crawford was competent and not legally insane and that Crawford had malingered his memory deficits. *Crawford I*, 716 So. 2d at 1037, 1052. All of this weighs against any conclusion that trial counsel did not conduct a sufficient investigation before trial. It is clear trial counsel made a concerted effort to obtain mental-health information about Crawford and presented that information at trial.

¶46.     Even if Crawford had made a substantial showing of constitutionally deficient representation, we must determine whether Crawford also has made a substantial showing that he suffered prejudice. To prevail, Crawford must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. This showing requires less than a preponderance of the evidence because "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id.* at 693–94 (emphasis added).

¶47.     But Crawford has not made a substantial showing of prejudice on this claim, even with the new experts he has obtained. Only very recently did his current successive PCR counsel subject Crawford to testing from Dr. Siddartha Nadkarni, Dr. Donna Schwartz-Watts, and Dr. Tora Brawley, who submitted their expert reports with detailed findings.

---

Johnny Rush Smith, mother; John Lee Montgomery, grandfather; Martha Montgomery, grandmother; Martha Crawford, stepmother; Clint Crawford, half-brother; and Rebecca Crawford, sister. *Crawford v. Epps*, 2008 WL 4419347, \*\*48-50 (N.D. Miss. Sept. 25, 2008).

21

Presumably, this is the new psychological-evaluation evidence that Crawford claims his first PCR counsel and trial counsel failed to investigate.

¶48.    But there are procedural problems with these new expert submissions. Only Dr. Brawley's submission is attested by an affidavit. Neither Dr. Nadkarni's nor Dr. Schwartz-Watts's reports are attested by sworn affidavits. Our statutes are clear that "[a]ffidavits of the witnesses who will testify and copies of documents or records that will be offered shall be attached to the motion." Miss. Code Ann. § 99-39-9(1)(e) (Rev. 2015). Thus, Dr. Nadkarni's and Dr. Schwartz-Watts's reports should not be given any consideration.

¶49.    Notwithstanding the lack of authenticity, the new reports do not show that trial counsel's failure to investigate this particular information prejudiced Crawford's defense. Dr. Nadkarni reviewed many medical files and other affidavits–only recently obtained–from family members. What brings this report into question is that Dr. Nadkarni apparently accepted everything that Crawford told him as true. In his report, Dr. Nadkarni rejected the findings that Crawford was malingering his memory and psychological problems. Yet we do not see where Dr. Nadkarni administered any test for malingering.[7] This is critical because, as both the district court and Fifth Circuit noted in federal habeas proceedings, earlier testing showed that Crawford was malingering his memory defects. Drs. Lott and McMichael consistently found in their evaluations that Crawford was malingering his memory defects. *Crawford*, 531 Fed. App'x at 520. Drs. Lott and McMichael also reviewed

---

[7] The ineffective-assistance-of-counsel opinion by the federal district court discusses the fact that Crawford's self-reported statements regarding his mental condition were not credible. *Crawford v. Epps*, 2008 WL 4419347, \*\*48-50, *vacated in part by* *Crawford v. Epps*, 353 Fed. App'x 977 (5th Cir. 2009).

FBI interviews conducted with Crawford as well as his mental-health records. *Id.* The records consistently showed that Crawford had malingered symptoms "of psychogenic amnesia, and [that] he had a history of feigning mental health problems . . . ." *Id.*; *see also Crawford v. Epps*, 2012 WL 3777024, \*\*1, 2, 10 (N.D. Miss. Aug. 29, 2012); *Crawford I*, 716 So. 2d at 1037.

¶50.    As to Crawford's "traumatic brain injury," Dr. Nadkarni notes that "Charles has had literally countless head injuries." Yet not one of these supposed injuries was documented by medical records. Additionally, there was testimony from several family members and friends at trial, but no proof of these head injuries was presented.

¶51.    Crawford had argued in federal habeas proceedings that his trial counsel had failed to present certain mitigating evidence, because trial counsel never had revealed to the jury that he might have organic brain damage resulting from an accident as a teenager. *Crawford*, WL 4419347, at \*47. The district court rejected this claim, finding that there was no indication that Crawford suffered from organic brain damage. *Id.* at \*50. In Dr. Hutt's report that Crawford submitted, he opined only, without having evaluated Crawford, that his seizures "could possibly be caused by organic brain damage resulting from a severe head injury in his late teens, but that an 'E.E.G.' test would need to be performed.'" *Id.* But Crawford, in fact, had received two CT scans and two EEGs in 1993. All results were normal except for one EEG, which showed more testing was indicated. *Id.*

¶52.    As to Crawford's epileptic seizures, there was never any pretrial diagnosis of epilepsy, nor were there any discussions of past seizures in the record. Dr. Nadkarni states

23

that Crawford "had no recollection of kidnapping nor killing . . . because these were done in a state of epileptic confusion or post-ictal confusion and that is why he does not remember it." But this finding is contrary to the facts. Crawford completely remembered the kidnapping, which he documented in detail in his statement to the FBI. *Crawford I*, 716 So. 2d at 1033-36. He claims only that he did not remember the burglary, the rape, or the murder. Regarding the alleged epileptic episodes in Dr. Nadkarni's report, it is worth noting that Dr. Russell had spent three days a week for ten months before trial examining Crawford. Dr. Webb also had spent nearly twenty hours examining Crawford. Neither reported Crawford having epileptic episodes while under their frequent observation. Dr. Nadkarni's report does not state that he observed any such episodes either. This adds doubt to Dr. Nadkarni's recent findings, as he saw Crawford for only a few hours, nearly twenty years after these events. Drs. Lott and McMichael also had evaluated Crawford on four different occasions, and neither noted any such activity.

¶53. Dr. Nadkarni also concludes that "the psychogenic amnesia diagnosis is the next best descriptor of the events . . . ." But this also was Dr. Russell's diagnosis and testimony at trial. *Crawford I*, 716 So. 2d 236. So the jury already has heard the "next best descriptor" argument, and they rejected it.

¶54. The other expert, Dr. Schwartz-Watts, stated that there were "neurocognitive deficits from multiple head injuries at the time of the offense." Again, no proof had been submitted of any head injuries. Thus, Dr. Schwartz-Watts started off with presumptions that were completely unsupported in the record. Dr. Schwartz-Watts also talked about Crawford's

24

seizure activity after the crime, but anything after the offense is not really relevant. She also stated that Crawford's testing was not completed at trial, but that is not the question now. The question now is, what are the results of the testing that Dr. Schwartz-Watts has done now that would have changed the result at trial? If Dr. Schwartz-Watts's new testing does not show anything that would change the result in this case, then her statement that the testing was not completed before trial makes little difference here.

¶55. As to Dr. Brawley, whose only report is attested by sworn affidavit, Crawford's testing seems fairly normal. Like Dr. Nadkarni, she relied on the presumption of a history of seizures and head injuries, neither of which has been proven sufficiently.

¶56. Finally, Crawford has not shown how these additional evaluations would have changed the result here, especially considering that the jury had the benefit of cumulative testimony, both at the guilt and the penalty phase, of his mental illness. Further, the investigation here is in sharp contrast to ineffective representation during the sentencing phase in other cases. *See, e.g.*, **William v. Taylor**, 529 U.S. 362, 395-96, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000) (finding counsel ineffective for failing to investigate and present substantial mitigating evidence such as the defendant's "nightmarish childhood" and records evidencing he was "borderline mentally retarded."); **Ross v. State**, 954 So. 2d 968, 1005-1006 (Miss. 2007) (finding counsel ineffective for failing to investigate potentially mitigating factors; "While Ross testified to the death of his family, physical abuse as a child, and his drinking problems, and his mother testified to the murder of his sister, defense counsel

provided *no expert evidence* about how these events had affected Ross psychologically.") (emphasis added).

¶57.  Dr. Russell gave his opinion that Crawford was insane under *M'Naghten*. He gave his opinion that Crawford was under extreme duress and under the influence of extreme mental or emotional disturbance. He reiterated that Crawford suffered from psychogenic amnesia. Dr. Webb also testified that Crawford had suffered most of his life from manic-depressive illness and that, at the time of the event, he was under extreme duress. Dr. Webb further stated that his illness impaired his ability to discriminate criminality. The jury also heard from the results of Crawford's many evaluations conducted at various mental-health facilities. It heard of Crawford's unstable childhood, the fact that Crawford had suffered from night terrors, that he had memory lapses, that he had mood swings, headaches, and possessed a fear of the dark, and that he exhibited the unusual behavior of blacking out all of the faces of girls and women in magazines and his school annual.

¶58.  We find that Crawford has failed to show that his trial counsel was constitutionally ineffective. Since this claim lacks merit, Crawford's first PCR counsel's failure to investigate new psychological-evaluation evidence did not prejudice Crawford. *Strickland*, 466 U.S. at 687, 104 S. Ct. 2052, 80 L. Ed. 674. This claim does not meet an exception to the procedural bars and should be dismissed.

> **III.   Whether Crawford's right to counsel was violated in 1993 when his then-attorney assisted law enforcement, agreed to a mental evaluation, and then withdrew from the case.**

26

¶59. Crawford must show that his trial counsel's performance was deficient and that the deficiency prejudiced the defense of his case. *Strickland*, 466 U.S. at 686, 104 S. Ct. at 2064, 80 L. Ed. 2d 674. Only then can he succeed on his claim that his first PCR counsel's alleged deficient performance resulted in prejudice.

¶60. Although prior counsel had raised Sixth Amendment arguments on direct appeal and the first post-conviction proceedings, Crawford argues that this claim is not procedurally barred. Crawford argues that, because his first PCR counsel was ineffective for failing to investigate and present this issue to the Court, this is the first time that counsel has argued to this Court that Crawford's Sixth Amendment right to counsel was violated due to Randy Fortier's conflict of interest.[8]

¶61. At the time of the murder, Randy Fortier was representing Crawford for unrelated criminal charges. After he received information that his client was a suspect for murder, Fortier provided assistance to law-enforcement officials in an attempt to prevent Crawford from committing further crimes. He then moved to withdraw as counsel. In his motion to withdraw, Fortier stated:

> Movant would show unto the Court that he has searched the depths of his soul, and there is no way that he can set aside his prejudiced feelings now existing towards the Defendant in order to capably and properly represent the Defendant to the best of his ability. The Defendant's conduct constitutes pursuit of an objective which the lawyer considers repugnant and imprudent.

_____

[8] *See, e.g.*, *Crawford II*, 867 So. 2d at 204-05 (arguing that Crawford was entitled to counsel's assistance before submitting to the court-ordered psychiatric exam); *Crawford I*, 716 So. 2d at 1037-41 (arguing that confessions must be suppressed because the FBI had interrogated Charles when it knew he was represented by counsel, had coerced Crawford's interrogation by denying him medical treatment, and had used illegally obtained information to interrogate Crawford).

Then, after Fortier filed this motion, he joined a motion by the State to have Crawford evaluated by the State Hospital at Whitfield to determine his sanity with regard to the capital-murder charge.

¶62.    Crawford now argues that Fortier had an actual conflict of interest, creating per se ineffective assistance of counsel. However, this Court rejected this very claim in an out-of-time appeal of Crawford's unrelated rape conviction. ***Crawford***, 192 So. 3d. 905.[9] The State had used the results of the same evaluation in that prosecution as well.  Because this Court already has considered and rejected this claim, it is barred by the doctrine of res judicata. ***EMC Mortg. Corp. v. Carmichael***, 17 So. 3d 1087, 1090 (Miss. 2009).

¶63.    Since this claim lacks merit, Crawford's first PCR counsel's failure to investigate and present this issue to the Court did not prejudice Crawford. ***Strickland***, 466 U.S. at 687, 104 S. Ct. 2052, 80 L. Ed. 674. This claim does not meet an exception to the procedural bars and should be dismissed.

> **IV.    Whether Crawford received ineffective assistance of counsel due to trial counsel's failure to suppress evidence used against him in the penalty phase.**

¶64.    This issue was decided against Crawford on post-conviction review. *See **Crawford II***, 867 So. 2d at 211. Further, Crawford raised several claims regarding the validity of his

---

[9] This claim also was addressed in Crawford's federal habeas proceedings. The district judge reviewed the Sixth Amendment claim and found that there had in fact been a violation of Crawford's right to counsel when Fortier signed off on the mental evaluation while he was in the process of withdrawing from representation of Crawford. But the district judge found that the error was harmless given that the State offered evidence about Crawford's mental state only in rebuttal after Crawford raised his insanity defense. *See **Crawford***, 2012 WL 3777024, at \*\*14-15. The Fifth Circuit agreed. ***Crawford***, 531 Fed. App'x at 515.

confession on direct appeal. This Court decided these questions on the merits against him. *See Crawford I*, 716 So. 2d at 1037-41. However, as with the other claims in his successive petition, Crawford claims that his first PCR counsel failed adequately to plead and investigate this claim.

¶65. Crawford must show that his trial counsel's performance was deficient and that the deficiency prejudiced the defense of his case. ***Strickland***, 466 U.S. at 686, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674. Only then can he succeed on his claim that his first PCR counsel's alleged deficient performance resulted in prejudice.

¶66. Crawford argues that his trial counsel provided constitutionally ineffective assistance by failing to move to suppress the testimony that the State's experts derived from the evaluation to which Fortier consented. He argues that the evaluation's results should have been suppressed because the State's experts provided inadequate Fifth-Amendment warnings.

¶67. Generally, decisions to make or forego certain motions fall within the ambit of trial strategy and will not constitute ineffective assistance. ***Cole v. State***, 666 So. 2d 767, 777 (Miss. 1995) (citing ***Murray v. Maggio***, 736 F.2d 279 (5th Cir. 1984)). However, counsel may be deemed ineffective where counsel fails to move to suppress evidence obtained in violation of the accused's constitutional rights if the petitioner shows that the motion would have been meritorious and that prejudice resulted from the evidence's admission. ***Davis v. State***, 743 So. 2d 326, 336 (Miss. 1999).

¶68. Crawford relies on the United States Supreme Court's decision in *Estelle v. Smith* to argue that a motion to suppress would have been meritorious. In that case, the Supreme Court held that a psychiatric evaluation by the State's experts, used to obtain evidence supporting a death sentence, implicates the defendant's Fifth-Amendment right against self-incrimination. *Estelle v. Smith*, 451 U.S. 454, 462–69, 101 S. Ct. 1866, 68 L. Ed. 2d 359 (1981). So the defendant must receive *Miranda*-type warnings prior to the evaluation. *Id.* at 466–67 (citing *Miranda v. Arizona*, 384 U.S. 436, 467, 86 S. Ct. 1602, 1624, 16 L. Ed. 2d 694 (1966)). And the warnings must include a specific caution that the defendant's statements may be used against him in the capital-sentencing proceeding. *Powell v. Texas*, 492 U.S. 680, 681, 109 S. Ct. 3146, 106 L. Ed. 2d 551 (1989).

¶69. Here, Crawford claims his motion to suppress would have been successful because the State's experts provided only the ordinary *Miranda* warnings at the outset of the evaluation, omitting the specific warning regarding use in a sentencing proceeding. But, even assuming Crawford received inadequate warnings, his Fifth-Amendment right against self-incrimination was not violated because Crawford's decision to assert an insanity defense in the guilt phase and a mitigation case based on psychological testimony obligated him to participate in the State's evaluation and waived his Fifth-Amendment right to that extent.

¶70. In *Estelle*, in which the Supreme Court held that the Fifth-Amendment right against self-incrimination attached to these psychiatric evaluations by the State, the Court distinguished cases in which the defendant pleaded insanity, stating:

> Nor was the interview analogous to a sanity examination occasioned by a defendant's plea of not guilty by reason of insanity at the time of his offense.

When a defendant asserts the insanity defense and introduces supporting psychiatric testimony, his silence may deprive the State of the only effective means it has of controverting his proof on an issue that he interjected into the case. Accordingly, several Courts of Appeals have held that, under such circumstances, a defendant can be required to submit to a sanity examination conducted by the prosecution's psychiatrist.[10]

¶71.   In fact, the *Estelle* court conditioned its Fifth-Amendment holding on the defendant's decision not to put his mental health at issue, stating "[a] criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding." *Estelle*, 451 U.S. at 468.

¶72.   Later, in *Powell v. Texas*, the Supreme Court reiterated this holding:

Language contained in *Smith* and in our later decision in *Buchanan v. Kentucky*, provides some support for the Fifth Circuit's discussion of waiver. In *Smith* we observed that "[w]hen a defendant asserts the insanity defense and introduces supporting psychiatric testimony, his silence may deprive the State of the only effective means it has of controverting his proof on an issue that he has interjected into the case." And in *Buchanan* the Court held that if a defendant requests a psychiatric examination in order to prove a mental-status defense, he waives the right to raise a Fifth Amendment challenge to the prosecution's use of evidence obtained through that examination to rebut the defense.

---

[10] *Estelle*, 451 U.S. at 465–66 (citing *United States v. Cohen*, 530 F.2d 43, 47–48 (5th Cir. 1976), *cert. denied*, 429 U.S. 855, 97 S. Ct. 149, 50 L. Ed. 2d 130 (1976); *Karstetter v. Cardwell*, 526 F.2d 1144, 1145 (9th Cir. 1975); *United States v. Bohle*, 445 F.2d 54, 66–67 (7th Cir. 1971), *overruled by U.S. v. Lawson*, 653 F.2d 299, 303 n.12 (7th Cir. 1981); *United States v. Weiser*, 428 F.2d 932, 936 (2nd Cir. 1969), *cert. denied*, 402 U.S. 949, 91 S. Ct. 1606, 29 L. Ed. 2d 119 (1971); *United States v. Albright*, 388 F.2d 719, 724–725 (4th Cir. 1968); *Pope v. United States*, 372 F.2d 710, 720–721 (8th Cir. 1967) (en banc), *vacated and remanded on other grounds*, 392 U.S. 651, 88 S. Ct. 2145, 20 L. Ed. 2d 1317 (1968)).

***Powell***, 492 U.S. at 684 (quoting ***Estelle***, 451 U.S. at 465 (citing ***Buchanan v. Kentucky***, 483 U.S. 402, 422–23, 107 S. Ct. 2906, 97 L. Ed. 2d 336 (1987)).

¶73.    Here, Crawford argues that his Fifth-Amendment right against self-incrimination was violated because he received inadequate Fifth-Amendment warnings at the outset of the State's evaluation.  But Crawford's counsel—as he says in his petition—"built both phases of Charles'[s] case around an insanity defense . . . ."  Because Crawford presented mental-health-related defenses in both the guilt and sentencing phases of his trial, he waived his right to refuse to participate in an evaluation by the State's experts to develop evidence to rebut his defenses and obviated the need for ***Estelle*** warnings.  So a motion to suppress the State's experts' testimony would not have been meritorious, and Crawford's trial counsel cannot be deemed ineffective for failing to make that motion.

¶74.    Since this claim lacks merit, Crawford's first PCR counsel's failure to investigate and adequately plead this issue to the Court did not prejudice Crawford. ***Strickland***, 466 U.S. at 687, 104 S. Ct. 2052, 80 L. Ed. 674. This claim does not constitute an exception to the procedural bars and should be dismissed.

> **V.      Whether newly discovered evidence shows that law enforcement ignored Crawford's assertion of his Fifth-Amendment right to counsel.**

¶75.    Crawford recognizes that the allegation of coercion of his confession was presented on direct appeal and was decided against him. *See **Crawford I***, 716 So. 2d at 1037-41.[11] This

---

[11] "The confession was taken in violation of Crawford's right to an attorney"; "the evidence shows that the confession was coerced from Crawford by denying him medical treatment"; "the confession was coerced from Crawford by law enforcement using information that was obtained in violation of Crawford's rights and is thus inadmissible as

claim also was presented in the original post-conviction petition and was decided against him. ***Crawford II***, 867 So. 2d at 211 (finding that the issue as to trial counsel's "failure to properly move to suppress confessions" was without merit). Thus, this claim is barred by the doctrine of res judicata. Miss. Code Ann. § 99-39-21(3) (Rev. 2015). Procedural bar notwithstanding, we will address Crawford's claim in light of new evidence he claims his current counsel has discovered.

¶76.    At trial and on direct appeal, Crawford argued that he had requested counsel prior to an FBI interrogation, but that the agents had failed to honor his request. ***Crawford***, 716 So. 2d at 1037, 1038. He suggested that the circuit court should have excluded his confession. ***Id.*** At that point, the court considered conflicting testimony from Crawford and the agents as to whether he had asserted his right to counsel. ***Id.***

¶77.    Crawford now argues that new evidence, which the prosecution failed to disclose, supports his claim. To be considered newly discovered evidence, the alleged newly discovered evidence must be "of such nature that it would be practically conclusive that had such been introduced at trial it would have caused a different result in the conviction or sentence." *See* Miss. Code Ann. §§ 99-39-5(2)(a)(i) & 99-39-27(9) (Rev. 2015). Crawford cites a recording of his forensic interview at Whitfield, containing numerous statements by Crawford that he had asserted his right to counsel during the FBI interrogation. He argues

---

fruit of the poisonous tree." ***Crawford I***, 716 So. 2d at 1037-41.

33

that, either the prosecution committed a ***Brady*** violation by failing to disclose this evidence,[12] or that his trial counsel was ineffective for failing to obtain this evidence.

¶78.   In ***Brady***, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." ***Id.*** at 87. This Court applies a four-part test to determine whether a ***Brady*** violation occurred. ***King v. State***, 656 So. 2d 1168, 1174 (Miss. 1995). To warrant reversal, the defendant must show "that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different." ***Id.*** Likewise, to show that defense counsel was ineffective for failure to obtain this information, Crawford must show a reasonable probability that the result of the suppression hearing would have been different. ***Strickland***, 466 U.S. at 694.

¶79.   Crawford cannot succeed on either claim.  During the suppression hearing, the circuit judge heard Crawford's testimony that he had asserted his right to counsel. He also heard conflicting testimony from FBI agents. This new evidence would provide the circuit judge only additional instances of Crawford claiming that he had asserted his right, leaving him in the same position of weighing Crawford's word against that of the agents. This claim is without merit. Had Crawford raised this claim in his first PCR motion, relief still would have been denied.

---

[12] ***Brady v. Maryland***, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

¶80. Thus, Crawford's first PCR counsel's failure to adequately plead and investigate this claim in the original PCR proceedings did not prejudice Crawford. *Strickland*, 466 U.S. at 687, 104 S. Ct. 2052, 80 L. Ed. 674. This claim does not meet an exception to the procedural bars and should be dismissed.

## VI. Crawford's Pro Se Application

¶81. Crawford's pro se Application for Leave to File Successive Petition for Post-Conviction Relief provides additional argument in support of the claims discussed above and raises two additional claims. First, Crawford claims that his trial counsel provided constitutionally ineffective assistance by choosing an insanity defense without investigating the possibility that the State had relied on falsified evidence. Second, he claims that he was deprived of a fair trial because the State had relied on falsified evidence. We find that Crawford has failed to make a substantial showing of evidence in support of these claims, and we deny his pro se application to proceed.

¶82. At trial, the State presented evidence that Crawford led authorities to the victim's body. Both of Crawford's claims rest on his belief that law enforcement officers officially had found the body some time earlier. Crawford reaches this conclusion because a police search dog located personal effects belonging to the victim before Crawford supposedly led them to the body. He suggests that a highly trained search dog could not have found the personal belongings without also finding the body. Crawford also cites an FBI memorandum which listed the victim as deceased before Crawford was arrested.

35

¶83. Crawford's claims must fail for several reasons. First, as discussed above, Crawford's counsel had substantial evidence to support an insanity defense. And notwithstanding an evidentiary basis, counsel's decision to pursue that defense must fall within the broad latitude given for trial strategy. *Id.* at 689. Second, Crawford provides no evidence to support his belief that the search dog must have found the victim's body because it found her belongings. Finally, the FBI memorandum is dated the same day that Crawford led police to the victim's body. We cannot determine from the documents presented that the memo predated Crawford's arrest.

¶84. Accordingly, Crawford has failed to make a substantial showing of merit on these two claims, and we deny his pro se application for leave to proceed.

## CONCLUSION

¶85. Crawford has shown neither first PCR counsel nor trial counsel was deficient under any of the above issues, nor has he shown prejudice due to any of the alleged errors. Thus, we deny Crawford's application.

¶86. **POST-CONVICTION RELIEF DENIED**.

**RANDOLPH, P.J., LAMAR, MAXWELL AND BEAM, JJ., CONCUR. COLEMAN, J., CONCURS IN PART AND IN RESULT WITH SEPARATE WRITTEN OPINION JOINED IN PART BY DICKINSON, P.J., AND KITCHENS, J. DICKINSON, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS AND KING, JJ.**

**COLEMAN, JUSTICE, CONCURRING IN PART AND IN RESULT:**

¶87. I am at a loss. Today's majority opinion, in which I concur in part and in result, holds that the doctrine of *res judicata* bars Crawford's claim of ineffective assistance of trial

36

counsel and his claim of ineffective assistance of post-conviction relief counsel. (Maj. Op. at ¶¶ 27, 33, 35, 62). The Supreme Court of Mississippi repeatedly and firmly has held that procedural bars in general, and *res judicata* specifically, do not apply to post-conviction claims of violations of fundamental rights. Our treatment of the time-honored procedural protections of the finality of judgments in criminal cases has reached the point that, apparently, not even the Supreme Court can apply them consistently – or, as the case may be, not apply them. Are we, as our cases hold, not to apply procedural bars to possible violations of fundamental rights? Do we apply them only in some cases? If we are to apply them only to some cases, then which cases?

¶88. Leaving aside the majority's application of *res judicata* to Crawford's claim that his Fifth Amendment protection against self-incrimination has been violated (Maj. Op. at ¶ 75) – and surely the right against self-incrimination is a fundamental one – no less than four times the majority writes that the doctrine applies to Crawford's claims of ineffective assistance of counsel. (Maj. Op. at ¶¶ 27, 33, 35, 62). The application of the doctrine to the claims of ineffective assistance of counsel might be understood if effective assistance of counsel were not a fundamental right, but it is. *Scott v. State*, 190 So. 2d 875, 876 (Miss. 1966) ("This fundamental right, to have the assistance of counsel for his defense guaranteed to the defendant by the Sixth and Fourteenth Amendments to the Constitution of the United States, was not granted the defendant.").

¶89. The Court has held – several times – that when a petitioner seeking post-conviction relief puts a fundamental right at issue, Mississippi courts will not apply various procedural

bars that might otherwise foreclose any relief. *See, e.g., **Rowland v. State***, 98 So. 3d 1032, 1036 (¶ 6) (Miss. 2012) (noting that, as to several fundamental rights, including the protection against double jeopardy, illegal sentencing, and denial of due process at sentencing, the procedural bars found in Mississippi's Uniform Post-Conviction Collateral Relief Act will not apply) (citing, *inter alia*, **Rowland v. State**, 42 So. 3d 503, 508 (Miss. 2010); ***Ivy v. State***, 731 So. 2d 601, 603 (Miss. 1999); ***Kennedy v. State***, 732 So. 2d 184, 186-87 (Miss. 1999); ***Grubb v. State***, 584 So. 2d 786, 789 (Miss. 1991); ***Smith v. State***, 477 So. 2d 191, 195 (Miss. 1985)).

¶90.    I wholly agree with the majority that, normally, the doctrine of *res judicata* would apply to bar the claims to which the majority would apply it. ***Little v. V & G Welding Supply, Inc.***, 704 So. 2d 1336, 1337-1338 (¶ 8) (Miss. 1997) ("*Res judicata* bars all issues that might have been (or could have been) raised and decided in the initial suit, plus all issues that were actually decided in the first cause of action.") (citing ***Estate of Anderson v. Deposit Guaranty Nat'l Bank***, 674 So. 2d 1254, 1256 (Miss. 1996)).  As I wrote in my dissent in ***Smith v. State***, 149 So. 3d 1027 (Miss. 2014), the law establishes that *res judicata* is a substantive bar, based on the merits of an action, rather than a procedural one. ***Id.*** at 1035-1038 (¶¶ 22-30) (Coleman, J., dissenting).  However, currently our application of *res judicta* and other bars in post-conviction relief matters, procedural or otherwise, is not normal.  My position in ***Smith*** was a dissent, and five justices joined the majority.  If the Court is to apply the law it has announced in ***Smith*** consistently, then *res judicata* cannot bar Crawford's claims of ineffective assistance of counsel.

¶91.     In *Smith*, the defendant, Donald Keith Smith, pleaded guilty to kidnapping, armed

carjacking, and felony fleeing. *Smith*, 149 So. 3d at 1030 (¶ 3). However, before he pleaded

guilty, the trial court entered an order of continuance directing that the defendant would

undergo a psychiatric evaluation before trial. *Id.* at 1029-1030 (¶ 2). The trial court,

however, failed to hold a competency hearing before accepting Smith's guilty plea, as

mandated by Uniform Rule of Circuit and County Court Practice 9.06. *Id.* at 1030 (¶ 3). At

issue in *Smith* was whether Smith should be allowed to proceed in the trial court on a

petition for post-conviction relief on the grounds of the trial court's failure to hold a

competency hearing. *Id.* at 1032-1033 (¶ 14).

¶92.     The petition at issue in *Smith* was Smith's second petition for post-conviction relief.

*Smith*, 149 So. 3d at 1030 (¶ 4). The *Smith* Court held that the right not to be convicted

while incompetent was a fundamental right and, therefore, not subject to the procedural bars.

*Id.* at 1031 (¶ 8). In holding the right to be fundamental, the *Smith* Court quoted *Drope v.*

*Missouri*, 420 U.S. 162 (1975), wherein the Supreme Court of the United States wrote, "the

prohibition [against trying or convicting an incompetent defendant] is fundamental to an

adversary system of justice." *Drope*, 420 U.S. at 172.

¶93.     As noted above, the *Scott* Court labeled the right to competent counsel a fundamental

one. Claims involving rights deemed to be fundamental are not subject to the procedural

bars, including *res judicata*, pursuant to *Smith*, as well as, *inter alia*, *Rowland v. State*, 98

So. 3d 1032, 1036 (¶ 6) (Miss. 2012) (noting that, as to several fundamental rights, including

the protections against double jeopardy, illegal sentencing, and denial of due process at

39

sentencing, the procedural bars found in Mississippi's Uniform Post-Conviction Collateral Relief Act will not apply) (citing, *inter alia*, **Rowland v. State**, 42 So. 3d 503, 508 (Miss. 2010); **Ivy v. State**, 731 So. 2d 601, 603 (Miss. 1999); **Kennedy v. State**, 732 So. 2d 184, 186-87 (Miss. 1999); **Grubb v. State**, 584 So. 2d 786, 789 (Miss. 1991); **Smith v. State**, 477 So. 2d 191, 195 (Miss. 1985)). Although I disagreed with **Smith**, unless it is overruled, it and the myriad other cases that also hold that claims of violations of fundamental rights will not be subject to the procedural bars should be applied consistently.

¶94. Sadly, our application of the fundamental-rights exception has been anything but consistent. Certainly, we have applied it to allow petitioners to proceed despite presenting claims that otherwise would have been barred. *See*, *inter alia*, **Chapman v. State**, 167 So. 3d 1170 (Miss. 2015); **Sims v. State**, 134 So. 3d 300, 302-303 (¶ 6) (Miss. 2014). On the other hand, there have been cases where we have ruled that claims of violations of fundamental rights were procedurally barred. In **Moffett v. State**, 156 So. 3d 835 (Miss. 2014), the Court held that the petitioner's claim of ineffective assistance of counsel was barred by *res judicata*. **Id.** at 866 (¶ 84). In **Rice v. State**, 134 So. 3d 292 (Miss. 2014), we held that a petitioner's claim of a biased trial judge was procedurally barred due to the failure of the petitioner to file a motion to recuse at trial.[13] **Id.** at 299 (¶ 6). In a published order in

---

[13]*See, e.g.*, **Withrow v. Larkin**, 421 U.S. 35, 47 (1975) (not only is biased decisionmaker constitutionally unacceptable, but legal system tries to prevent even probability of unfairness); **Tumey v. Ohio**, 273 U.S. 510, 523 (1927) (criminal defendant denied due process if judge has "direct, personal, substantial, pecuniary interest" in reaching conclusion against him); **Anderson v. Warden**, 696 F.2d 296, 299 (4th Cir.1982), *cert. denied*, 462 U.S. 1111 (1983) (en banc) (defendant's Fourteenth Amendment due-process right to fair trial "minimally means a fair and impartial judge and jury"); **United States v. Cassiagnol**, 420 F.2d 868, 878 (4th Cir.), *cert. denied*, 397 U.S. 1044 (1970) (one of the

***Bell v. State***, 123 So. 3d 924 (Miss. 2013), the Court in the same paragraph found both that the petitioner's claims *were* excepted from the procedural bars under ***Rowland*** and ruled his claims were barred by *res judicata*. ***Bell***, 123 So. 3d at 925. In ***Jones v. State***, 119 So. 3d 323 (Miss. 2013), we affirmed the Court of Appeals' holding that the petitioner's claim that he lacked the mental competency to plead guilty was time-barred and barred by *res judicata*. *Id.* at 326 (¶¶ 7, 9).

¶95.    All of the above-cited examples of the Court applying the procedural bars to a claim that a fundamental right has been violated predate ***Smith***, which was handed down on October 30, 2014, so perhaps one could argue that ***Smith*** expanded the list of fundamental rights beyond that recognized by either ***Rowland*** Court. One would be hard-pressed to do so, given the number of cases, cited above, that predate ***Smith*** in which the Court acknowledged the fundamental-rights exception to the application of the procedural bars, but it is a possibility. However, a look at the Court's orders issued on petitions for leave to proceed in the trial courts reveals that we continue to apply procedural bars to dismiss or deny claims for post-conviction relief, even if based on claimed violations of fundamental rights. In ***Neal v. State***, a panel of the Court dismissed as time-barred the petitioner's claim that his right to a trial by jury had been violated. ***Neal v. State***, 2016-M-00705 (Miss. June 22, 2016). In ***Morris v. State***, the Court entered an order dismissing as procedurally barred an application for leave to proceed in the trial court that included allegations of an illegal sentence and ineffective assistance of counsel. ***Morris v. State***, 2015-M-01817 (Miss. June

fundamental rights of the accused is a fair trial by an impartial tribunal).

41

15, 2016). In *Wilson v. State*, the Court dismissed as procedurally barred a petitioner's claim of a *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), violation and a claim of an illegal search and seizure. *Wilson v. State*, 2016-M-00450 (Miss. May 25, 2016). In *Bosarge v. State*, the Court dismissed as barred by *res judicata* and as a successive writ a claim by the petitioner that he received ineffective assistance of counsel. *Bosarge v. State*, 2011-M-01304 (Miss. July 21, 2016). The above list of orders, in which fundamental-rights claims were dismissed or denied as procedurally barred, was compiled by surveying orders handed down by the Court in May and June of 2016 alone.

¶96.    As shown above, the Court has continued to dismiss or deny as procedurally barred claims of fundamental-rights violations after *Smith*. Based on my review of our dispositions of such claims, I cannot escape the impression that, at best, our application of the procedural bars to claims of fundamental-rights violations is inconsistent. At worst, it is random. *Smith* establishes that *res judicata* and the other procedural bars cannot apply to fundamental-rights claims, such as the claims of ineffective assistance of counsel made by Crawford. To the extent that the majority employs *res judicata* to bar Crawford's claims, I dissent. However, as the conduct that lies at the heart of Crawford's ineffective assistance of counsel claim – the failure of PCR counsel to investigate – appears to have been caused not by counsel but by court orders, I concur in the result.

**DICKINSON, P.J., AND KITCHENS, J., JOIN THIS OPINION IN PART.**

**DICKINSON, PRESIDING JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

42

¶97. One important feature of our criminal justice system not found in many jurisdictions around the world is our constitutional emphasis on the right to due process of law, a right that, among other things, theoretically provides criminal defendants—no matter how specious or unlikely their theories or claims—the opportunity to be heard in their defense.

¶98. In death-penalty cases, like this one, this Court, through its precedent, claims that our standard of review "'is one of '*heightened scrutiny*' under which *all bona fide doubts are resolved in favor of the accused*."[14]  In truth, in many cases, the State appears to receive the benefit of every doubt, and the Court appears to value procedural nicety over constitutionally protected rights.  This case is just such a case.

¶99. Charles Crawford's attorney made a strategic decision to base his capital-murder defense on Crawford's mental health.  In the guilt phase, he presented an insanity defense.  In the mitigation phase, he attempted to show that Crawford's mental health rendered him less culpable and not deserving of death.  We cannot—and I do not—now question that strategy.  But, when counsel chose that defense strategy, he assumed the duty to employ it with constitutionally mandated effectiveness.  Indeed, he had an obligation to support that defense with an appropriate investigation—and in this case, there was none.  Before trial, an expert witness informed him further testing was necessary to adequately convey Crawford's mental health to the jury.  He made no attempt to obtain that testing.

---

[14] ***Grayson v. State***, 118 So. 3d 118, 125 (Miss. 2013) (quoting ***Chamberlin v. State***, 55 So. 3d 1046, 1049–50 (Miss. 2010) (quoting ***Flowers v. State***, 773 So. 2d 309, 317 (Miss. 2000))) (emphasis added).

43

¶100. So Crawford now claims his trial counsel's failure to investigate and obtain the testing amounted to constitutionally ineffective representation. I pause here to emphasize that the matter before us today is not whether Crawford's counsel was or was not ineffective. The only matter before us is whether Crawford should be heard on the matter.

¶101. The majority, without providing him an in-court opportunity to be heard, denies his claim out of hand. Why? Because, in the majority's eyes (not the factfinder's eyes, mind you), any expert testimony—no matter how lacking, and no matter how unprepared because of the lack of necessary testing—was enough expert testimony.

¶102. We are not left to guess whether Crawford, should he be given the opportunity, has evidence to present to the factfinder. He now has obtained the testing his trial counsel knew was necessary but failed to pursue. Crawford presents us detailed expert opinions that would strongly have supported his defense. His burden before this Court—at least according to the standard of review our opinions claim we observe—is slight. To get a hearing, a petitioner "'must allege . . . with specificity and detail' that his counsel's performance was defective and that the deficient performance prejudiced the defense,"[15] and the standard by which we review capital cases, including petitions for post-conviction relief "'is one of 'heightened scrutiny' under which all bona fide doubts are resolved in favor of the accused."[16]

---

[15] *Hymes v. State*, 703 So. 2d 258, 261 (Miss. 1997) (quoting *Brooks v. State*, 573 So. 2d 1350, 1353 (Miss. 1990)).

[16] *Grayson*, 118 So. 3d at 125 (quoting *Chamberlin*, 55 So. 3d at 1049–50 (quoting *Flowers*, 773 So. 2d at 317)).

¶103. At a minimum, Crawford has made the substantial showing necessary to obtain an in-court opportunity so that testimony may be heard and weighed by a factfinder with the well-recognized need to observe witness testimony firsthand. But rather than provide him a hearing, the majority prefers to serve as quasi-factfinders, without a hearing, and to deny his claim outright.

## ANALYSIS

¶104. This Court rightly has recognized that a petitioner under sentence of death possesses the right to effective representation in post-conviction proceedings.[17] Post-conviction counsel's deficient performance cannot preclude the petitioner's opportunity to file meritorious claims for relief.[18] If a petitioner provides us a reasonable basis to believe that a circuit judge could find the necessary elements to show that his first post-conviction counsel provided objectively unreasonable representation, we should grant leave to proceed with a successive petition.[19]

¶105. Here, Crawford has presented sufficient information to conclude that his first post-conviction counsel provided objectively unreasonable representation. In *Grayson v. State*, in which this Court recognized the right to effective post-conviction counsel in death-penalty cases, Justice Lamar, writing for the majority, detailed the errors which constituted counsel's deficient performance. The majority stated:

---

[17] *Grayson*, 118 So. 3d at 126 (citing *Jackson v. State*, 732 So. 2d 187, 191 (Miss. 1999); *Chamberlin*, 55 So. 3d at 1049).

[18] *Grayson*, 118 So. 3d at 128.

[19] *Id.* at 127–29.

Ryan described how the MOCPCC [Mississippi Office of Capital Post-Conviction Counsel] was understaffed, underfunded and overworked. . . . He stated that minimal, if any, investigation, research, and evaluation were conducted prior to filing the PCR petitions. Ryan stated that, as of January 2003—about one month before Grayson's PCR petition was due—he was the only attorney employed by the MOCPCC and had done nothing in Grayson's case.

. . .

These affidavits reveal that minimal investigation into Grayson's PCR claims was conducted a few days before the PCR motion was due. The only investigation conducted prior to filing the petition were a few phone calls to jurors who would not discuss the case, one request for records—which were not received—and brief interviews with and affidavits from four of Grayson's family members. The MOCPCC did not conduct any independent discovery or investigation and did not seek expert assistance. Counsel for Grayson did not obtain the files from the prosecutor, from law enforcement, or from the State's experts, even though counsel was entitled to these files pursuant to Rule 22(c)(4)(ii) of the Mississippi Rules of Appellate Procedure. Trial counsel was never interviewed. Even though the Court allowed sixty additional days to file a supplemental PCR, no additional investigation was conducted. This Court found the issues raised in the PCR pleadings were "virtually identical" to those asserted on direct appeal. This Court noted the lack of evidentiary support for many of the claims.[20]

¶106. Here, Crawford provides a strikingly similar history to support his claim of deficient performance by prior post-conviction counsel. Thomas C. Levidiotis was appointed by the Circuit Court of Tippah County to represent Crawford in the preparation of his first petition for post-conviction relief. Levidiotis, who ultimately withdrew after a dispute as to compensation, filed Crawford's initial petition. He has now provided an affidavit, explaining that he lacked adequate time and funds to investigate Crawford's claims and prepare his petition.

---

[20] *Id.* at 127–28 (internal citations omitted).

¶107. Levidiotis admits that he "was unable to conduct *any* mitigation investigation for Mr. Crawford's post-conviction petition," and he states:

> I knew that I would need to identify additional mental health experts to evaluate Mr. Crawford, and intended to rely on Gary Mooers to make this determination. I also needed to develop a comprehensive psychosocial history of Mr. Crawford, and intended to have Gary Mooers do the work necessary to develop that history. The particular issue I believe was key to developing a mitigation case was uncovering Mr. Crawford's true psychiatric problems and his reasons for suppressing memories. However, because the circuit court denied my request for expert funds, *I was unable to retain Dr. Mooers and additional mental health experts to conduct a complete evaluation of Mr. Crawford*.

¶108. He goes on to state that, because Crawford's trial experts "did not have access to many of Mr. Crawford's health records, and did not prepare a psychosocial history," that he "had a particular obligation to take on this mitigation investigation," but "lacked the expertise, training, and experience to identify and develop mitigation evidence."

¶109. After Levidiotis withdrew, the Mississippi Office of Capital Post-Conviction Counsel acquired Crawford's case. William Clayton, a staff attorney in that office, worked on Crawford's petition. In his affidavit, Clayton explains that:

> [d]ue to severe staffing and resource shortages, the office was drowning in work when I started to work there. . . . *I had to manage an excessive caseload with very limited resources and virtually no professional litigation support, including the use of experts*. . . . Our office needed to do an investigation and supplement the PCR to ensure that all of Mr. Crawford's post-conviction claims were developed and properly plead[ed]. Although the MOCPCC had Mr. Crawford's case for several months prior to my arrival, *it did not appear that any significant work had been done on the case by the time I started* to work on it . . . a crushing caseload, staff turnover, time limitations, and *inadequate investigative and expert resources prevented me from conducting an adequate investigation* and filing a complete supplement to Mr. Crawford's PCR. I recall that I made one trip to Mr. Crawford's home town to meet with his father, and I also met with Mr. Crawford on about two occasions. . . . To

47

the best of my knowledge, ***the MOCPCC did not attempt to obtain Rule 22 discovery*** . . . . the MOCPCC did not conduct any juror interviews. I spoke to Mr. Crawford's father on a few occasions, and our office may have interviewed one other family member.

(Emphasis added.)

¶110.  No meaningful difference exists between the performance of ***Grayson's*** counsel and that of Crawford's first post-conviction counsel.  Moreover, this Court's opinion denying Crawford's initial post-conviction petition identifies the pervasive deficient performance counsel provided.[21]  One passage from that opinion particularly conveys counsel's failure to investigate.

> However, Crawford has failed to even allege any information outside of the knowledge of counsel, much less provide the necessary affidavits of such. ***With such a glaring lack of evidence by which to determine if Crawford was prejudiced, there is no need to even examine the reasonableness of counsels' investigation.***
>
> The lack of new evidence also impacts Crawford's claim that counsel was ineffective in their presentation of evidence during the penalty phase of trial.

---

[21] ***Crawford v. State***, 867 So. 2d 196, 207–10 (Miss. 2003) ("Notwithstanding Crawford's failure to cite any authority in support of his argument, we will swiftly deal with this issue"; "Crawford, however, cites no authority for this proposition"; "Crawford has not alleged such facts here"; Crawford "has failed to include an affidavit from any expert which states what exculpatory testimony they would have provided were Crawford able to afford it"; "he cites no authority for the proposition that any of his counsel's efforts in these regards have fallen below any kind of standard"; "Crawford makes a general assertion that 'counsel failed to ensure that a proper investigation take place.' However, he states nothing more and does not allege what counsel did or failed to do in investigating"; "This would have put Crawford and counsel for this petition on notice as to the levels of Dilantin that Crawford may have been on, yet there is no affidavit provided in the petition as to the effects of such a dosage on Crawford"; "Thus, it is now Crawford's burden to show facts which would have changed since the original determination or to provide an affidavit by a doctor who would have testified as to his incompetency, or perhaps to have simply found how much medication Crawford was on at the time and provided a medical opinion as to the effects of such a level of medication. However, he has not done so.").

> Because Crawford is unable to challenge the investigation, we are left with no alternative but to treat it as complete and judge counsels' decisions regarding the presentation of evidence as if they had been made according to a complete investigation and, thus, give great deference to any claims of trial strategy.[22]

¶111. The majority concludes that Levidiotis did perform an objectively reasonable investigation because a three-justice panel of this Court denied his request for expert funds. This holding is misguided for several reasons. First, the three-justice panel denied Levidiotis's request for funds to hire *a mitigation investigator*. But, Crawford's present contentions deal not with the failure to hire a mitigation investigator, but rather with the failure to procure the necessary expert testimony related to Crawford's mental health.

¶112. Second, even if the three-justice panel had denied a request for funds to procure that expert testimony, the panel's stated reason for denying the request was that ***Crawford's attorney failed to show the funds were necessary***. As will be explained further in the prejudice analysis, we now know those funds were necessary. Indeed, the failure of Crawford's counsel to make that showing before the three-justice panel supports a finding that he provided ineffective representation.

¶113. Third, Levidiotis ultimately withdrew as Crawford's first post-conviction counsel, and his representation was then assumed by the Office of Capital Post-Conviction Counsel, which was created, and funded, to perform this type of investigation in capital-post-conviction proceedings. But, more importantly, the majority's circular reasoning overlooks the requirements of due process. The majority first finds Crawford's application for a hearing is procedurally barred because his first post-conviction counsel did not perform an

---

[22] *Id.* at 218 (emphasis added).

objectively unreasonable investigation. To support this finding, the majority points out that counsel's investigation was not unreasonable because this Court denied him the funds necessary to prepare that application, so there really was nothing he could do. And Crawford's claims lacked merit because his counsel failed to support the application with the information those funds (which this Court denied) would have procured. The majority effectively holds that Crawford's first post-conviction counsel did not deny him adequate representation—this Court did.

¶114. An ineffectiveness challenge based on counsel's failure to investigate must focus on whether counsel's decision to forego certain investigation was reasonable.[23] Where, as here and in *Grayson*, counsel fails to investigate information which counsel knows is necessary adequately to present the petitioner's claims, the investigation cannot be deemed reasonable.

¶115. So I would find that Crawford's first post-conviction counsel provided objectively unreasonable representation. But, as with a claim of ineffective trial counsel, first post-conviction counsel's failure also must create prejudice to constitute ineffective assistance.[24] To determine whether prejudice exists from first post-conviction counsel's deficient performance, this Court considers whether Crawford has made a substantial showing of merit on his present claims.[25] I believe he has done so on one claim.

*Trial Counsel's Failure to Obtain a Complete Psychological Evaluation*

---

[23] ***Doss v. State***, 19 So. 3d 690, 695 (Miss. 2009) (quoting ***Strickland v. Washington***, 466 U.S. 668, 690–91, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)).

[24] ***Grayson***, 118 So. 3d at 128–29.

[25] ***Id.***

¶116. Crawford claims that he received constitutionally ineffective assistance because trial counsel failed to investigate Crawford's organic brain damage. Despite the fact that a defense expert told trial counsel before trial that certain psychological testing could explain Crawford's behavior through the existence of organic brain damage, counsel never obtained that testing or requested funds for such testing from the circuit court. Then, counsel attempted to present an insanity defense and mitigation case based on Crawford's mental health, without ever subjecting Crawford to necessary psychological testing.

¶117. An ineffectiveness challenge based on counsel's failure to investigate must focus on whether the decision to forego certain investigation was reasonable.[26] We have stated that "psychiatric and psychological evidence is crucial to the defense of a capital murder case"[27] and that "there is a critical interrelation between expert psychiatric assistance and minimally effective representation."[28] Further, though this Court gives deference to counsel's strategic decisions, we have found that "it was unreasonable for counsel not to pursue psychological evidence" when the investigation fails "to follow through on the chosen strategy."[29]

---

[26] *Doss*, 19 So. 3d at 695 (quoting *Strickland*, 466 U.S. at 690–91).

[27] *State v. Tokman*, 564 So. 2d 1339, 1343 (Miss. 1990) (citing *Ake v. Oklahoma*, 470 U.S. 68, 80, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985)).

[28] *Tokman*, 564 So. 2d at 1343 (citing *Beavers v. Balkcom*, 636 F.2d 114, 116 (5th Cir. 1981); *Wilson v. Butler*, 813 F.2d 664, 672 (5th Cir. 1987); *Greer v. Beto*, 379 F.2d 923, 925 (5th Cir. 1967); *Gray v. Lucas*, 677 F.2d 1086, 1095 (5th Cir. 1982)).

[29] *Tokman*, 564 So. 2d at 1344 (citing *Leatherwood v. State*, 473 So. 2d 964 (Miss. 1985)).

¶118. Crawford's counsel strategically decided to present an insanity defense and to raise similar claims during the penalty phase. This strategy hinged on Crawford's mental health and, as counsel's chosen strategy, required counsel to follow through with a reasonable investigation to support that strategy.

¶119. Now affidavits show counsel failed to do so. Dr. Mark Webb evaluated Crawford and testified for the defense in Crawford's trial. Prior to trial, Dr. Webb discovered that "Crawford had a history of head injuries and seizures as well as a history of substance abuse." He knew that "[a]ll of these things can cause organic brain damage" and that "the presence of brain damage would act as significant mitigating evidence in and of itself since symptoms of organic impairment include perceptual disturbance (misinterpretations, hallucinations), disorientation, personality change, and decreased control over sexual, aggressive, and acquisitive impulses." He also noted that "certain types of brain damage decrease one's ability to control impulses . . . ."

¶120. Dr. Webb concluded that Crawford should "undergo a neuropsychological battery to determine the existence and extent of any brain dysfunction" and that "until such is done, it cannot be said that Mr. Crawford has had a complete psychological workup." And Dr. Webb informed Crawford's counsel prior to trial that Crawford needed this testing.

¶121. Crawford's trial attorneys admit they failed to obtain a complete psychological evaluation in preparation for trial. James Pannell, Crawford's lead trial counsel, states that:

> Although I used an insanity defense in all three of Mr. Crawford's trials, ***I did not retain a mental health expert to conduct a forensic evaluation of Mr. Crawford***. Instead, I relied on the Parchman psychiatrist, Dr. Stanley Russell, who treated Mr. Crawford during his period of incarceration prior to the

52

capital murder trial, and Dr. Mark Webb, a psychiatrist retained by Mr. Crawford's sister. They gave conflicting assessments and diagnosis of Mr. Crawford. . . . I believe the inadequacies of their evaluations arose because we did not have resources to conduct a thorough and reliable investigation of Mr. Crawford's background.

¶122.  Likewise, David Bell, Pannell's co-counsel, states:

we did not use the services of a mitigation investigator for this case. We did not file a motion requesting funds to hire a mitigation investigator. Given Mr. Crawford's history of mental health problems, I believe that a detailed and thorough mitigation investigation was critical to adequately prepare for the penalty phase of Crawford's trial.
. . .

*we also did not seek funds for or hire a mental health expert or neuropsychologist to evaluate and test Mr. Crawford*. I believe this testing and evaluation were necessary, given Mr. Crawford's history, for the defense to adequately prepare for and present the penalty phase of the trial.

¶123. Dr. Webb informed the attorneys prior to trial that a full psychological evaluation was necessary to present Crawford's claims adequately. In light of Crawford's affidavits, I must conclude that Crawford has made a substantial showing that his trial attorneys provided objectively unreasonable representation by failing to follow through with an investigation into known evidence necessary to present their chosen trial strategy.

¶124. But, to prevail in the circuit court, Crawford also would have to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[30] This showing requires less than a preponderance of the evidence because "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, *even if the errors of counsel cannot be shown by a*

---

[30] *Strickland*, 466 U.S. at 694.

53

*preponderance of the evidence to have determined the outcome*."[31]  And to obtain leave to proceed in the trial court, Crawford need only make a substantial showing that he can meet that burden.

¶125.  Crawford's current counsel has obtained the testing that Dr. Webb advised trial counsel to obtain.  Drs. Siddartha Nadkarni, Tora Brawley, and Donna Schwartz-Watts have submitted expert reports, detailing their findings.

¶126.  Dr. Nadkarni states:

> Charles Crawford suffers from Severe Brain Injury, Partial Epilepsy, and Migraines.  His neurological examination is grossly abnormal and reveals significant central nervous system injury with evidence of Brain Injury as well.
> . . .
>
> I have no doubt that Charles Crawford was in an Epilepsy related delirium *at the time the capital murder was committed*, resulting from acute seizures and persistent post-ictal confusion in what was most probably non-convulsive status epileticus.  As such, *he would have no awareness of his actions, nor agency in committing them*.  He is a severely brain-injured man (corroborated both by history and his neurological examination) who was essentially not present in any useful sense due to epileptic fits at the time of the crime.[32]

¶127.  Dr. Schwartz-Watts states:

> Mr. Crawford suffers from a neurocognitive disorder due to his history of traumatic brain injury and his seizure disorder with behavioral disturbance. He has cognitive deficits in his verbal memory, verbal learning, frontal lobe function and motor function.
> . . .
>
> Persons with seizure disorder often have amnesia for periods of time after their seizures.  Seizures with temporal lobe focus can manifest inter-ictal behaviors including hypersexuality, hypergraphia, and hyperreligiosity.

---

[31] *Id.* at 693–94 (emphasis added).

[32] (Emphasis added.)

¶128. In *Doss v. State*, this Court found prejudice in a similar investigatory failure.[33] There, this Court relied on the decision of the United States Supreme Court in *Rompilla v. Beard*, where the Court determined that the failure to present evidence of known organic brain damage prejudiced a defendant's capital-murder sentencing phase.[34] Similar to counsel's ineffective assistance in *Ross* and *Rompilla*, Crawford's counsel failed to conduct an adequate investigation into Crawford's psychological health, which, if performed, would have uncovered organic brain damage. That brain damage, according to Crawford's experts, significantly impaired or eliminated his ability to control his actions. I believe Crawford has made a substantial showing that his trial counsel should have investigated and discovered this evidence and that it likely would have affected the decision of at least one juror considering Crawford's insanity defense and mitigation evidence.

¶129. In the evidentiary hearing, *Strickland* requires Crawford to show only a reasonable probability—less than a preponderance of the evidence—that the result would have been different.[35] Given that both criminal verdicts and death sentences must be unanimous, Crawford need only show a reasonable probability that one juror would have changed his or her mind. And, given that Crawford has obtained more complete, detailed, and nuanced expert testimony than he had at trial, he must have made the mere substantial showing that he can meet this burden, which is all he must do at this stage of the litigation.

---

[33] *Doss*, 19 So. 3d at 708.

[34] *Id.* (citing *Rompilla v. Beard*, 545 U.S. 374, 393, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005)).

[35] *Strickland*, 466 U.S. at 694.

¶130. Certainly, the circuit judge, as factfinder in the evidentiary hearing, would examine the expert testimony Crawford had at trial, and that which he has now obtained, and easily could conclude that Crawford failed to meet his burden of proof. In that event, this Court could not reverse unless that conclusion was clearly erroneous.[36]

¶131. But because Crawford has made a substantial showing of merit on this claim, he satisfies the *Grayson* prejudice prong for ineffective assistance of first post-conviction counsel and is entitled to proceed with his successive petition on this claim, so that the factfinder may make that call. For this reason, I cannot join the majority decision to deny Crawford that opportunity.

**KITCHENS AND KING, JJ., JOIN THIS OPINION**.

---

[36] ***Rowland v. State***, 42 So. 3d 503, 506 (Miss. 2010) (citing ***Moore v. State***, 986 So. 2d 928, 932 (Miss. 2008)).